**UNITED STATES of America**

v.

**Aleksandras LILEIKIS.**

**Civil Action No. 94–11902–RGS.**

United States District Court,
D. Massachusetts.

May 24, 1996.

David S. Mackey, Chief, Civil Division, Assistant U.S. Attorney, District of Massachusetts, William Henry Kenety V, Senior Trial Attorney, Office of Special Investigations, Criminal Division, U.S. Department of Justice, argued, Donald K. Stern, United States Attorney, District of Massachusetts, Eli M. Rosenbaum, Director, Office of Special Investigations, Susan L. Siegal, Acting Principal Deputy Director, Office of Special Investigations, on the brief, Boston, MA, for U.S.

John Rogers Carroll, Carroll & Carroll, Philadelphia, PA, Thomas J. Butters, Butters, Brazilian & Small, Boston, MA, for Defendant.

*MEMORANDUM OF DECISION AND ORDER ON GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT*

STEARNS, District Judge.

On September 21, 1994, the United States filed this seven-count denaturalization Complaint against the defendant Aleksandras Lileikis, the head of the Lithuanian internal security service (Saugumas) for Vilnius during the German Nazi occupation of Lithuania. The Government alleges that Lileikis illegally obtained United States citizenship by failing to disclose his personal involvement in genocidal crimes, specifically, his complicity in the systematic murder of Lithuanian Jews by the Nazis. Count I charges that Lileikis's citizenship must be revoked because his participation in the persecution of Jews made him ineligible for entry into the United States.

Count V alleges that Lileikis lacks the moral character required by law of applicants for United States citizenship. Before the court is the Government's motion for summary judgment on Counts I and V.

## FACTS

### 1. The Organizational Structure of the Nazi Liquidation of the Jews

As Lileikis acknowledges in his brief, it is a "well-known historical fact" that the subjugation, persecution, and ultimate extermination of the Jewish people was a driving tenet of Nazi ideology. Memorandum in Opposition, at 10. That advancement of this perverse aim was integral to the German war effort is also an acknowledged fact.[1] The precise mechanisms set up by the Nazis to achieve a "Final Solution" by rendering the territory within their control *judenrein* ("cleansed of Jews"), and the role played by local security forces such as the Saugumas, are, however, central to the dispute before the court and require some explication.

During the Nazi administration of Europe, operational responsibility for the destruction of Eastern European Jewry was entrusted to the German *"Einsatzgruppen,"* special subdivisions of the quasi-military Nazi Security Police (*Sicherheitspolizei,* or "SIPO"),[2] and Security Service (*Sicherheitsdienst,* or "SD"). The task of liquidating the Jews of the Baltic states was assigned to *Einsatzgruppe A,* commanded by SS General Walter Stahlecker. *Einsatzgruppe A* was divided into mobile company-sized detachments called *Einsatzkommandos. Einsatzkommando 3,* led by SS Colonel Karl Jager, was responsible for the Vilnius region beginning in August 1941. In December 1941, the *Einsatzkom-*

*mandos* were posted to fixed locations, and *Einsatzkommando 3* received a new title, *Kommandeur der Sicherheitspolizei und des SD–Litauen* (Commander of Security Police and SD–Lithuania, or "KdS"). With the methodical passion that characterized the Nazi regime, Colonel Jager submitted an accounting to General Stahlecker on December 1, 1941, itemizing by man, woman and child, *Einsatzkommando 3*'s daily accomplishments in murdering some 21,000 Jews.[3] The bulk of the killings took place at an excavation site in the Lithuanian village of Paneriai (six miles from Vilnius), where the displaced Soviet occupation force had begun the construction of a petroleum tank farm. The Jews selected for execution were first concentrated at Lukiski Hard Labor Prison in Vilnius, and then marched or trucked to Paneriai. There they were stripped of their clothing and any remaining possessions, and then shot in groups of ten at the rim of the petroleum pits by the *Ypatingas Burys* ("Special Detachment"). The *Ypatingas Burys,* a Lithuanian volunteer unit, dutifully maintained "execution cards," tallying each person killed with a slash in red or blue pencil. Most of the cards also contain a written confirmation of the execution order, usually with a euphemistic remark like *befehlsgemaess behandelt,* a German phrase literally translated as "treated according to orders,"[4] or more bluntly with *"liqu.,"* the German abbreviation for *liquidiert,* or "liquidated."

### 2. Background of Lileikis, his Role in the Nazi Security Structure

■ Aleksandras Lileikis was born on June 10, 1907, in Lithuania. He joined the

---

1. "In the eastern territories the soldier is not merely a warrior fighting according to the rules of the art of war, but also the merciless bearer of a national ideology.... Therefore the soldier must comprehend the necessity of cruel but just revenge against subhuman Jewry." Order of the Day of Field-marshal Von Reichenau, issued to the Sixth German Division on October 10, 1941. See *A History of the Jewish People,* at 1025. (H.H. Ben–Sasson, ed., Harvard University Press, 1976).

2. The SIPO was in turn comprised of the Secret State Police, the *Geheime Staatspolizei,* or "*Ge-*

*stapo,"* and a lessor known criminal police unit known as the *"Kripo."*

3. The report, entitled "Comprehensive Listing of Executions Carried Out in the Operational Area of EK.3 Through 1 December 1941" totaled the number of murdered Jews by month. Each new month's accounting began with a line reading "balance forward" listing the running total of murdered Jews. Exhibits to the affidavit of Dr. Yitzhak Arad, Tab 59.

4. Another common euphemism, "taken for labor," appears on many of the cards.

Saugumas, the Lithuanian plainclothes "security police," in 1927. By 1936, Lileikis had risen to the rank of Deputy Chief of the Saugumas for the Marijampole region. In 1939, he transferred to Vilnius to become Deputy Chief of the Provincial Office. In June, 1940, when the Soviet Union invaded Lithuania, Lileikis fled to Berlin, where he stayed for eight months and began the process of obtaining German citizenship. Lileikis returned to Lithuania shortly after the Germans seized control in June, 1941. Most of Lithuania's governing institutions had buckled under the destabilizing impact of the successive Soviet and Nazi occupations. The Saugumas, however, was quickly reconstituted by the Nazis to conduct "police work which cannot be performed by the SD's own [German] personnel[,] particularly searches, arrests, and investigations. . . ." See U.S. National Archives and Records Administration Nuremberg International Military Tribunal Exhibit L–180, "Comprehensive Report up to 15 October 1941" of SS General Walter Stahlecker, Tab 1 to Arad affidavit, at 10–11.[5] Within two months of his return to Lithuania, Lileikis was named Chief of the Saugumas for Vilnius province. At the end of the war, Lileikis retreated with the defeated Germans. He lived in Germany until 1955 when he emigrated to the United States.[6]

3. *The Role of the Saugumas in the Persecution and Murder of the Jews of Vilnius*

The Lithuanian civil authority installed by the Nazis in 1941 promulgated a series of anti-Jewish decrees. Jews were required to wear a visible yellow Star of David; they were "prohibited from walking the streets from 6:00 pm to 6:00 am;"[7] they were forbidden to use the sidewalks and main streets of the center of Vilnius; they could shop only at certain stores during specified times of the day; they were prohibited from entering most public buildings and parks; they could not possess a radio; they were required to perform forced labor; and their foreign currency, precious metals, jewelry, and other valuables were forfeited to the state. On September 6, 1941, the Jews of Vilnius were forcibly concentrated into two ghettos. The ghettos were isolated from the outside world by barbed-wire, barricades, and armed guards. Lacking basic sanitation, medical supplies, food, and heat, the overcrowded ghettos were intended to promote the spread of disease among their Jewish inhabitants.

The Saugumas was responsible for enforcing the anti-Jewish decrees, and in particular those restricting Jews to the ghettos. To this end, the Saugumas formed a special branch called the *Komunistu–Zydu Sekcijas* (the "Communists–Jews Section") which was assigned the task of arresting suspected Communists and Jews, escapees from the ghettos, Jews who had resisted the orders to concentrate in the ghettos, and non-Jews who hid, aided, or did business with Jews. The evidence submitted by the Government details instances of Saugumas officers arresting people for offenses such as "susp[ected]

5. The Saugumas worked well with the German security forces. General Stahlecker reported that, "[a]fter the removal of . . . accused and unfit personnel . . . the Lithuanian Security and Criminal Police produced entirely satisfactory work. . . ." Id.

6. Because the United States authorities knew that Lileikis had been Chief of the Security Police of Vilnius during the Second World War and moreover, knew that he was "possibly connected with the shooting of Jews," Lileikis asserts that the Government is estopped from pursuing his denaturalization. It is extremely doubtful that equitable estoppel can be raised as a defense to a government action. See *Heckler v. Community Health Services of Crawford County, Inc.* 467 U.S. 51, 60–61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984); *Phelps v. Federal Emergency Management Agency*, 785 F.2d 13, 16–17 (1st Cir.1986) (noting that because of concerns over sovereign immunity, separation of powers, and public policy, "[t]he Supreme Court . . . has consistently refused to apply the equitable estoppel doctrine against the government, no matter how compelling the circumstances") (footnote omitted)). Even if an estoppel defense were available in concept, it would be inapplicable to the facts of this case. Lileikis is at best the would-be beneficiary of the Government's alleged error. *Heckler*, 467 U.S. at 59, 104 S.Ct. at 2223–24 (estoppel may only be raised by a party who relied on the actions of his opponent "in such a manner as to have changed his position for the worse") (internal citation omitted).

7. July 3, 1941 Order of Vilnius City and District Citizens' Committee and Vilnius City and District Auxiliary Police. Tab 21.

of being a Jew," "hiding," "escaping from the ghetto," and being "a threat to the current order." Included in the documents are the records of a Saugumas "sting" operation in which a truck driver, working for the Saugumas, offered to transport Jews secretly out of Vilnius for a fee. The driver took at least three truckloads of Jews out of Vilnius and delivered them into the hands of the Saugumas. The captive Jews were arrested, sent to the Lukiski prison, and from there transferred to the custody of the German Security Police to be shot by the *Ypatingas Burys* at Paneriai. Tabs 155–159.

4. *Documentation of Orders, Signed by Lileikis, Regarding the Arrest, Detention, and Transfer for Execution of Jewish Prisoners*

Almost all of the internal records of the Saugumas were destroyed by the German and Lithuanian authorities as they fled Vilnius. However, thousands of documents, particularly those dealing with the disposition of prisoners held at the Lukiski prison, survived the war and are now stored in the Lithuanian Central State Archives. Western researchers were denied access to the documents until the collapse of the Soviet Union. Since the opening of the archives by the newly independent Lithuanian state, a number of documents have come to light bearing Lileikis's signature or issued over his name, attesting to his involvement in the persecution and murder of Lithuania's Jews. Three examples follow: [8]

* On November 21, 1941 Lileikis personally signed an order confining Chaja Lapyda, "who escaped from the ghetto," in the Lukiski prison. Three days later, Lileikis signed a second order transferring her to the custody of the German Security Police. The Government has also supplied a copy of Chaja Lapyda's execution card, which states that she was "treated according to orders" on December 5, 1941.

* On December 1, 1941, Gita Kaplan was arrested for fleeing from the Jewish ghetto with her six year old daughter, Fruma. Lileikis signed and issued a "Decision" which read: "Chief of the Lithuanian Security Police for Vilnius Province, A. LILEIKIS, having reviewed the interrogation of the Jew GITA KAPLAN, born in 1896 in Vilnius, who escaped from the ghetto along with her juvenile daughter FRUMA, and was hiding at the residence of ADOLFAS DOMEIKAS, born [sic] 63 years old, and JUOZAPATAS DOMEIKAS, 38 years old, both of the Baltoji Voke estate in Rudamina Township, where they hid the escaped Jew KAPLAN. . . . GITA KAPLAN, her daughter FRUMA, ADOLFAS DOMEIKAS and JUOZAPATAS DOMEIKA are to be placed in the Vilnius Hard Labor Prison, and will be held at my disposition." The next day, Lileikis signed a document ordering that "the Jew GITA KAPLAN, born in 1896, and her daughter Fruma, being held at my disposition, be turned over as of 2 December to the German Security Police Chief." The execution cards reflect that Gita and Fruma Kaplan were "treated according to orders" on December 22, 1941.

* On December 11, 1941, Lucija Pojevanskaite–Sutarskaite,[9] a Roman Catholic woman who was born in the United States, was arrested in Vilnius. That same day, Lileikis signed an order addressed to the Chief of the Vilnius Hard Labor Prison which stated "I am sending the arrestee

---

8. These examples are only representative, and by no means exceptional cases. Lileikis ordered that Saulius Varsavskis, who was arrested for escaping from the ghetto, be confined at Lukiski on November 26, 1941. Varsavskis's prison record shows that he was 18 years old, had completed one year of study towards a degree in economics, and was married to Ita Buchbinda, who at the time resided in "ghetto I." On December 6, 1941, Lileikis signed an order that Varsavskis be transferred to the custody of the Chief of the German Security Police. His execution card shows that he was "treated according to orders" on December 22, 1941. See Tabs 126–127.

Similarly, Dovydas Palenbaumas, ("treated according to orders" on December 22, 1941, Tabs 128–129), Malka Strazaite ("treated according to orders" on December 22, 1941, Tabs 130–131), Antoni Konas, ("treated according to orders" on December 22, 1941, Tabs 123, 132), Beila Levinson (Tabs 135–136), and Necha Berger–Levita (Tabs 137–138), are names that would have been lost to posterity but for these surviving records.

9. Lucija Pojevanskaite–Sutarskaite's name is spelled inconsistently in the relevant documents.

LIUCINA POJEVONSKTE–SUTAR-SKYTE, who is suspected of being a Jew. I request that you keep her in prison at my disposition." On December 17, 1941, an order issued from Lileikis's office directing that "the arrestee LIUCINA POJEVONSKYTE–SUTARSKYTE be transferred to the disposition of the Chief of the German Security Police as of this date." The execution card of Lucina Pojewonska-Schutarka, dated 23 December 1941, with "Jewess" next to her name, reports that she "was treated in accordance with orders on 22 December, 1941."

Tabs 100 and 149 (Chaja Lapyda), Tabs 95, 124–125 (Gita and Fruma Kaplan), and Tabs 133–134 (Pojevanskaite).

Lileikis does not deny that the Nazis largely succeeded in exterminating the Jews of Vilnius. Nor does he deny that he personally ordered the Saugumas officers under his command to cooperate with the Nazis in arresting, detaining, and delivering thousands of Jews to the death squads. Memorandum in Opposition, at 17. Lileikis's main argument is that summary judgment is inappropriate because his role as Chief of the Vilnius Saugumas "in the persecution of the Jews as described in the government documents, was a purely ministerial and custodial function," insufficient to justify revocation of his citizenship. Id. He also challenges the authenticity of the Government's documents and the credibility of its affiants.

### PROCEDURAL BACKGROUND

In his answer to the Complaint, Lileikis invoked the Fifth Amendment privilege against self-incrimination and refused to admit or deny the Government's substantive allegations. The Government filed a motion to compel, and in a September 15, 1995 Memorandum of Decision, I ruled that if the Government could demonstrate a legitimate domestic law enforcement purpose for its request, Lileikis would be ordered to answer the balance of the Complaint. After further briefing, I ruled that Lileikis did not have a valid claim of privilege and that the Government had acted properly in seeking to compel his answers. See November 16, 1995 Memorandum of Decision and Order On Plaintiff's Motion to Compel. Despite the ruling, Lileikis affirmed in a December 12, 1995 submission to the court that he would persist in his refusal to answer on Fifth Amendment grounds. On December 18, 1995, the Government filed a motion requesting that paragraphs 15–21 of the Complaint be deemed admitted pursuant to Fed. R.Civ.P. 8(d). Lileikis failed to file a response, and on January 9, 1996, the Government's motion was allowed. See *Rogers v. Webster*, 776 F.2d 607, 610–611 (6th Cir. 1985); *United States v. Klimavicius*, 847 F.2d 28, 35 (1st Cir.1988). On February 9, 1996, Lileikis sought reconsideration in light of a late-filed opposition. The motion for reconsideration was denied on March 29, 1996. To date, Lileikis has persevered in his refusal to answer the Complaint. He also refused to answer questions about his wartime activities during his deposition.

### LEGAL STANDARDS

Because "[f]ew rights are as symbolically important in our democratic country as the right to acquire and keep American citizenship," *United States v. Hutyrczyk*, 803 F.Supp. 1001, 1006 (D.N.J.1992), the Supreme Court has made clear that the government "carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship." *Costello v. United States*, 365 U.S. 265, 269, 81 S.Ct. 534, 536, 5 L.Ed.2d 551 (1961). That burden requires the government to present "clear, unequivocal, and convincing" evidence supporting denaturalization. *Fedorenko v. United States*, 449 U.S. 490, 505, 101 S.Ct. 737, 746, 66 L.Ed.2d 686 (1981), (internal citations omitted). On the other hand, American citizenship is bestowed only upon those who meet fundamental standards imposed by law. For this reason, courts must require "strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship." Id. at 506. Indeed, the Supreme Court has ruled that "district courts lack equitable discretion to refrain from entering a judgment of denaturalization against a naturalized citizen whose citizenship was procured illegally." Id. at 517, 101 S.Ct. at 752. See also Immigration and Nationality Act (INA), 8 U.S.C. § 1451(a).

Under section 14(a) of the Refugee Relief Act of 1953, the statute under which Lileikis obtained a visa to enter the United States:

> [n]o visa shall be issued under this Act to any person who personally advocated or assisted in the persecution of any person or group of persons because of race, religion or national origin.

To be legally eligible for naturalization, a candidate must comply with 8 U.S.C. § 1427(a)(1) which states that:

> [n]o person ... shall be naturalized unless such applicant, (1) immediately preceding the date of filing his application for naturalization has resided continuously, *after being lawfully admitted for permanent residence,* within the United States. [Emphasis added].

The INA also mandates that only candidates who "ha[ve] been and still [are] person[s] of good moral character, attached to the principles of the Constitution of the United States" may become United States citizens. 8 U.S.C. § 1427(a)(3).

■ Summary judgment in a civil case is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact and [where] the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *Gaskell v. Harvard Cooperative Society,* 3 F.3d 495, 497 (1st. Cir.1993). "In this context, 'genuine' means that the evidence is such that a reasonable jury could resolve the point in favor of the nonmoving party." *Rodriguez–Pinto v. Tirado–Delgado,* 982 F.2d 34, 38 (1st Cir.1993). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir.1990). "If the [opposing] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). The rules of summary judgment are the same in a denaturalization proceeding. *United States v. Koreh,* 59 F.3d 431, 433 n. 1 (3d Cir.1995).

*DISCUSSION*

Because Lileikis, by virtue of his refusal to answer paragraphs 15–21 of the Complaint, has been deemed to have admitted the substantive allegations of the Complaint, the Government is entitled to summary judgment on counts I and V. Lileikis's repeated invocation of the Fifth Amendment in response to deposition questions might also entitle the Government to summary judgment. Lileikis's refusal to answer such questions as "During this period of time [when you served as Chief of the Saugumas], were the Jews of Vilnius ever forced to live in ghettos?"; "You knew that most or all of the individuals you turned over to the Special Detachment would be killed, didn't you?"; "Did you ever personally participate in the interrogation or torture of prisoners?"; and "Isn't it a fact that you routinely transferred Jews to Lukiski knowing that they would be executed?"; creates a compelling inference that the Government's allegations against Lileikis are true. See *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976); *Serafino v. Hasbro,* 82 F.3d 515, 518 (1st Cir.1996).

■ The Government, however, seeks summary judgment on an independent ground. The Government has submitted copies of 194 documents (containing over a thousand pages of material) obtained from the Lithuanian Central State Archives, the affidavits of several experts testifying to the authenticity of these documents, and the detailed affidavit of Dr. Yitzhak Arad, an historian distinguished for his studies of the Vilnius ghettos. In response, Lileikis simply argues that the Government has not presented sufficient credible evidence to carry its burden of proof. Lileikis's argument has four components: first, that the documents submitted by the Government are unreliable because of their fragmentary nature and doubtful provenance; second, that Dr. Arad, upon whose interpretation of the documents the Government relies, lacks credibility as an historian of the Nazi era in Lithuania; third, that the Government has failed to show that Lileikis "personally advocated or assisted in the persecution" of others as required by the Refugee Relief Act; and fourth, that evi-

dence showing that Lileikis enabled at least one Jew to escape death creates a question of fact as to the extent of his personal involvement in the Nazi extermination campaign. None of these contentions has merit.

### 1. *Validity of Documents*

Lileikis argues that "the government's moving papers are based on inadmissible documents and affidavits, are not based on personal knowledge and that its 'material facts' are really conclusions which do not justify summary judgment." Memorandum in Opposition, at 2. The documents obtained from the Lithuanian Central State Archives are all well over twenty years old [10] and have been authenticated under both Fed.R.Evid. 901(b)(8) and 902(3).[11] See *Sokaogon Chippewa Community v. Exxon Corp.*, 805 F.Supp. 680, 711 n. 34 (E.D.Wisc., 1992) ("[O]nce the [ancient] documents have been authenticated, they are presumed to be reliable, and [if] the non-moving party questions their reliability, he must bear the burden of impeachment.").

Lileikis's claims regarding the possibility of Soviet tampering or forgery are totally unsubstantiated and incredible. Lileikis concedes that the documents "were held by the Soviets for nearly 50 years and hidden from public view." Memorandum in Opposition, at 28. As the Government aptly asks, why would even the KGB go to the trouble of forging documents implicating Lileikis in war crimes, and then bar all access to its handiwork for some fifty years, while awaiting the collapse of the government whose evil intentions towards Lileikis it presumably sought to serve? [12]

### 2. *Dr. Arad's Credibility*

Lileikis impugns Dr. Arad's credibility because his testimony in the trial of Ivan Demjanjuk was purportedly criticized "by Holocaust scholars and American courts precisely on the ground of bias and the lack of scholarship." See Memorandum in Opposition, at 13. However, he cites nothing in the Israeli Supreme Court's decision reversing Demjanjuk's conviction that implies criticism of Dr. Arad's testimony, nor does he offer by name a single Holocaust scholar or American court that has questioned Dr. Arad's work.

### 3. *Displaced Persons Act and the Refugee Relief Act*

Lileikis points out that the cases cited by the Government in support of the proposition that Lileikis "advocated or assisted in the persecution of any person or group of persons because of race, religion or national origin," arose under the Displaced Persons Act (DPA), and not the Refugee Relief Act (RRA). Lileikis argues that the cases are therefore not on point because the DPA, unlike the RRA, did not require that an applicant "personally" advocate persecution in order to be ineligible for a visa.

It is true that there are no reported decisions that quantify the level of "personal" advocacy or assistance of persecution that is

---

**10.** The following are not excluded by the hearsay rule, even though the declarant is available as a witness. . . .

> (16) Statements in ancient documents. Statements in a document in existence twenty years or more the authenticity of which is established.

Fed.R.Evid. 803(16).

**11.** The copies of the documents presented to the court have been confirmed as authentic by the Director of the Lithuanian Central State Archives, attested by the Head of the Legalization Division of the Lithuanian Ministry of Foreign Affairs, and certified by a consular official of the United States Embassy in Vilnius.

**12.** Dr. Arad has testified that the documents were found where documents relating to the Ger-

man occupation of Lithuania would be expected to be found, that they were internally consistent and consistent with documents found in similar archives. The Government has also submitted the affidavits of two examiners from the United States Secret Service Forensic Sciences Division attesting that forensic examination of a sampling of the documents (selected by counsel for both sides) yielded no indication that they had been altered or were falsely dated, that they were consistent in format and composition with their dating, and that the typewriting was of a kind in use in 1941. Also in the record is the affidavit of William McCarthy of the United States Immigration and Naturalization Service Forensic Document Laboratory, which states that the "Lileikis" signatures on these documents match exemplars of Lileikis's known handwriting. Lileikis has offered no forensic or expert evidence disputing these experts' opinions.

sufficient to disqualify an applicant for admission to the United States under the RRA. It is also historically plausible that, as Lileikis argues, inclusion of the word "personal" in the RRA was intended by Congress to extend immigration privileges to some war refugees who could not qualify for admission under the DPA. However, Lileikis's activities so clearly constitute "personal participation" in persecution that the semantical contours of the word "personal" as used in the RRA are irrelevant to his case.

The Aleksandras Lileikis revealed in the documents is anything but the "disembodied signer of orders" described in his pleadings. Memorandum in Opposition, at 11.[13] The undisputed facts show that as Chief of the Vilnius Saugumas, Lileikis ordered the arrest of persons for such crimes as "susp[ected] of being a Jew," "escaping from the ghetto," and "hiding" a six year old child. The undisputed record also shows that Lileikis ordered these same persons removed from the hard labor prison under his direct control and turned over to either the *Ypatingas Burys* or the German Security Police. While it is true that there is no documented instance of Lileikis personally executing a Jew, it is inconceivable that in enacting the RRA, Congress intended to exclude from the United States the triggermen of genocide while opening the door to their commanding officers.[14]

### 4. Lileikis's Alleged Aid to Jews

In his Memorandum in Opposition, at 21, Lileikis suggests that he may have "filled the position as the Chief of the Vilnius office of the Saugumas ... for the purpose of using the office, whenever he could, in aid of the underground and trying to help the persecuted persons whenever he was able to." This self-flattery is bereft of any factual support. Lileikis asserts that "[t]his view of [his] actual conduct is not a pipe dream, ... [because it] has been made public in a magazine arti-

cle." *Id.* An untranslated copy of an article, purportedly published in the Lithuanian language newspaper *Draugas,* is attached to Lileikis's Opposition with an English language "abstract" of its contents. The author of the article denies the existence of the Saugumas, and states that he recalls having read a story recounting that Lileikis rescued a young Jewish girl named Sifra Grodnikaite. Even if this article, the name of its author, or the name of the beneficiary of Lileikis's alleged intervention had been disclosed in discovery (they were not), the article and its assertions are incompetent hearsay. Moreover, the fact (if it is one) that Lileikis might have saved a solitary Jew from destruction does not atone for the tens of thousands who died under his command of the Saugumas.

### REQUEST FOR ADDITIONAL TIME

Lileikis finally requests a 90 to 120 day continuance "to either obtain the additional discovery needed or confirm that it is unavailable." Memorandum in Opposition, at 35. What is to be sought is not described, nor is any explanation offered as to why it has not been found to date, or why it might become suddenly accessible. Fed.R.Civ.P. 56(f) allows that "[s]hould it appear from the affidavits of a party opposing [a motion for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment." Lileikis has not presented, either by affidavit or otherwise, any sufficient reason justifying further delay. Thus, the request for an extension is *DENIED.*

### ORDER

For the foregoing reasons, the Government's motion for summary judgment on Counts I and V of the Complaint is *ALLOWED.* Because Lileikis was never eligi-

---

**13.** As the Government nicely put it at oral argument, Lileikis is attempting to stand the classic Nuremburg defense on its head by arguing that "I was only *issuing* orders."

**14.** Indeed, it is difficult to accept the proposition that murder is the only crime of persecution on account of "race, religion, or national origin" interdicted by the RRA. One would think that

ordering the arrest of a woman solely because she was suspected of being a Jew, and the confinement of a six year old girl in a hard labor prison for "hiding" after being spirited from a ghetto by her mother, would satisfy even the most liberal construction of the term "persecution."

ble for admission to the United States, that a factual dispute may exist as to the extent to which he misrepresented his war crimes on his immigration documents is irrelevant to the Court's determination that his citizenship should be revoked. Therefore, Counts II, III, IV, VI, and VII, being moot, are *DISMISSED* without prejudice.[15]

SO ORDERED.

---

15. Counts II, IV, and VII allege that Lileikis illegally procured his citizenship by falsely stating that he did not assist in the persecution of persons on the basis of race, religion, or nationality in violation of Section 11(e) of the RRA and Section 212(a)(19) of the Immigration and Naturalization Act, and that his citizenship must therefore be revoked pursuant to 8 U.S.C. § 1451(a). Count VI alleges that Lileikis's misrepresentations regarding his wartime activities constitute "false testimony" under 8 U.S.C. § 1101(f)(6), thereby disqualifying him as a person of "good moral character" eligible for naturalization, requiring that his citizenship be revoked under 8 U.S.C. § 1451(a). Count III alleges that because 22 C.F.R. § 42.42(a)(29) (1954 Supp.) disallowed the issuance of an entry visa to any alien who "advocated or acquiesced in activities or conduct contrary to civilization and human decency on behalf of a power which was at war with the United States during World War II," Lileikis's entry into the United States was unlawful pursuant to 8 U.S.C. § 1427(a)(1), and his citizenship must therefore be revoked in accord with 8 U.S.C. § 1451(a).