# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 04-1728

———————

United States of America,     &ast;
              &ast;
    Appellee,     &ast;
              &ast; Appeal from the United States
  v.         &ast; District Court for the
              &ast; Eastern District of Missouri.
Adam Friedrich,      &ast;
              &ast;
    Appellant.    &ast;

———————

Submitted: February 17, 2005
Filed: March 31, 2005

———————

Before WOLLMAN, HANSEN, and BENTON, Circuit Judges.

———————

WOLLMAN, Circuit Judge.

Adam Friedrich appeals from the district court's[1] order that he be denaturalized pursuant to 8 U.S.C. § 1451. We affirm.

## I.

Friedrich was born in Romania in 1921. In 1941, he attempted to join the *Wehrmacht* (German Armed Forces) but was denied entry because he was not a German citizen. He instead volunteered for the *Schutzstaffel* (SS), and began active

---

[1]The Honorable Carol E. Jackson, Chief Judge, United States District Court for the Eastern District of Missouri.

duty in October 1942.  Following basic training, Friedrich was assigned to the Death's Head Battalion at the Gross-Rosen concentration camp in German-occupied Poland.  Gross-Rosen had approximately 100,000 prisoners when Friedrich arrived in January 1943.  The prisoners were used as slave labor in a nearby stone quarry and received inadequate food, clothing, and medical care.  Nearly 1,500 died in the first five months of 1943.

In August 1943, Friedrich and other guards marched approximately 200 prisoners from Gross-Rosen to the Dyhenfurth concentration camp.  Friedrich remained as a guard at Dyhenfurth until the camp was evacuated in January 1945.  At that time, Friedrich and other guards marched approximately 1,000 prisoners more than thirty miles back to Gross-Rosen.  The winter march took several days and the prisoners slept without blankets in open fields.  Gross-Rosen was evacuated the following month, and Friedrich was among the guards who escorted approximately 1,000 prisoners to the Flossenbürg concentration camp.  After walking for nearly a day, the prisoners were loaded onto unheated cattle cars for a rail trip that lasted more than a day.  The prisoners were not provided with food or sanitation facilities during the trip and many did not survive.  Friedrich served as a guard upon his arrival at Flossenbürg.  When the camp was evacuated in April 1945, Friedrich accompanied prisoners on a march to the Dachau concentration camp.  During the march, American soldiers overtook the group and Friedrich fled unnoticed.

In 1948, the United States began admitting certain European refugees for permanent residence, without regard to regular immigration quotas, under the Displaced Persons Act (DPA), Pub. L. No. 80-774, 62 Stat. 1009 (1948).  Persons who had "assisted the enemy in persecuting civilians" were ineligible for visas under the DPA.  See Fedorenko v. United States, 449 U.S. 490, 509-10 (1981).  Two years later, Congress amended the DPA to provide in relevant part that:

No visas shall be issued under the provisions of this Act . . . to any person who advocated or assisted in the persecution of any person because of race, religion, or natural origin.

Pub. L. No. 81-555 § 13, 64 Stat. 219, 227 (1950). In 1953, Congress enacted a successor law to the DPA, the Refugee Relief Act of 1953 (RRA), Pub. L. No. 83-203, 67 Stat. 400 (1953), amended by Pub. L. No. 83-751, 68 Stat. 1044 (1954). The RRA provided that:

No visa shall be issued under this Act to any person who personally advocated or assisted in the persecution of any person or group of persons because of race, religion, or national origin.

Pub. L. No. 83-203 at § 14(a), 67 Stat. at 406 (emphasis added).

In 1953, Friedrich applied for a visa under the RRA. He stated in his visa application that he had been in the German Army from 1942 to 1945 but made no mention of his service with the SS or his duty at the concentration camps. Friedrich was granted a visa in 1955 and subsequently was naturalized in 1962. After learning of Friedrich's involvement with the SS, the United States sought to revoke his citizenship under Section 340(a) of the Immigration and Nationality Act of 1952, codified at 8 U.S.C. § 1451(a). The district court granted summary judgment to the government and revoked Friedrich's citizenship.

## II.

We review *de novo* the district court's grant of summary judgment. Mayer v. Nextel West Corp., 318 F.3d 803, 806 (8th Cir. 2003). In ruling on a motion for summary judgment, the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. Id.

The government carries a heavy burden of proof in a denaturalization proceeding and evidence justifying revocation of citizenship must be "clear, unequivocal, and convincing." Fedorenko, 449 U.S. at 505. Nonetheless, an illegally procured naturalization may be set aside. Id. at 506. A naturalization is illegally procured if an applicant fails to comply strictly with all of the congressionally imposed prerequisites to the acquisition of citizenship Id. One of these statutory prerequisites is that an applicant has been "lawfully admitted for permanent residence." United States v. Negele, 222 F.3d 443, 447 (8th Cir. 2000) (quoting 8 U.S.C. § 1427(a)). An individual is not lawfully admitted for permanent residence if he entered the country without a valid immigration visa. Id.

In Fedorenko, the Supreme Court concluded that under the plain language of the DPA, "an individual's service as a concentration camp armed guard—whether voluntary or involuntary—made him ineligible for a visa." 449 U.S. at 512. As Friedrich points out, however, Fedorenko and nearly all other cases involving revocation of citizenship actions against former members or supporters of the Nazi regime arose under the DPA, not the RRA. The only case to address the RRA in this context is United States v. Lileikis, 929 F.Supp. 31 (D. Mass. 1996). Friedrich's primary legal argument is the same raised by the defendant in Lileikis: that the RRA's addition of the modifier "personally" to the DPA's prohibition against advocating or assisting in persecution decreased the class of individuals ineligible for permanent residence. Id. at 38-39.[2]

---

[2]The defendant in Lileikis had been the head of the Lithuanian internal security service during the Nazi occupation of Lithuania. United States v. Lileikis, 929 F.Supp. 31, 32 (D. Mass. 1996). The court observed that although it was "historically plausible" that "inclusion of the word 'personally' in the RRA was intended by Congress to extend immigration privileges to some war refugees who could not qualify for admission under the DPA," the defendant's activities "so clearly constitute[d] 'personal participation' in persecution that the semantical contours of the word 'personal' as used in the RRA [were] irrelevant to his case." Id.

Friedrich contends that "in light of the need to impart some meaning to the word 'personally,'" we should interpret it to require that an applicant must have had a subjective mental intent to engage in persecution. A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as having their ordinary, contemporary, common meaning. United States v. Fountain, 83 F.3d 946, 952 (8th Cir. 1996). We agree with the district court that nothing in the ordinary meaning of the word "personally" suggests that it connotes "having a subjective mental intent about."

Friedrich also asserts that there is no evidence that he "engaged in individual acts of a persecutory nature such as whipping [or] beating." This argument misconstrues the statutory language. Qualifying words or clauses refer to the next preceding antecedent except when evident sense and meaning require a different construction. Mandina v. United States, 472 F.2d 1110, 1112 (8th Cir. 1973) (citing KARL LLEWELLYN, THE COMMON LAW TRADITION 527 (1960)). Accordingly, the modifier "personally" refers to "advocated" and "assisted" (which are connected by the disjunctive "or").[3] The pertinent question is therefore whether Friedrich "personally assisted" in persecution, not whether he engaged in direct persecution.[4]

We accept as true for purposes of our review Friedrich's contentions that he never saw a prisoner escape, never harmed a prisoner, never discharged his weapon while guarding prisoners, and never saw any prisoners die during the forced

---

[3]The only other plausible statutory construction is that the modifier "personally" refers only to "advocated" and leaves "assisted" unmodified, an interpretation that is even less helpful to Friedrich.

[4]Unless exceptional circumstances dictate otherwise, when the terms of a statute are unambiguous, judicial inquiry is complete. United States v. Vig, 167 F.3d 443, 448 (8th Cir. 1999).

evacuation marches. Friedrich admitted, however, that he served as a Death's Head guard at the concentration camps and during forced marches, that he was armed during these duties, and that he had strict orders to shoot prisoners attempting to escape.

We have recently observed in a slightly different context that an armed Death's Head concentration camp guard, "by impeding prisoners' escape through his presence," was "actively and personally involved in persecution." Negele v. Ashcroft, 368 F.3d 981, 983 (8th Cir. 2004) (involving removal under the Holtzman Amendment, 8 U.S.C. § 1182(a)(3)(E)). We see no reason to reach a different conclusion here. History provides us with a description of the conditions at Flossenbürg, one of the camps at which Friedrich's armed presence impeded the escape of prisoners:

> Flossenbürg concentration camp can best be described as a factory dealing in death. Although this camp had in view the primary object of putting to work the mass slave labour, another of its primary objects was the elimination of human lives by the methods employed in handling the prisoners. Hunger and starvation rations, sadism, inadequate clothing, medical neglect, disease, beatings, hangings, freezing, forced suicides, shooting, etc., all played a major role in obtaining their object. Prisoners were murdered at random; spite killings against Jews were common, injections of poison and shooting in the neck were everyday occurrences; epidemics of typhus and spotted fever were permitted to run rampant as a means of eliminating prisoners; life in this camp meant nothing. Killing became a common thing, so common that a quick death was welcomed by the unfortunate ones.

The Nürnberg Trial, 6 F.R.D. 69, 118 (1946) (quoting June 21, 1945, report of the War Crimes Branch of the Judge Advocate's Section of the 3d U.S. Army). By guarding the perimeters of the Gross-Rosen, Dyhenfurth, and Flossenbürg concentration camps to ensure that prisoners did not escape from these unspeakable

conditions, Friedrich personally assisted in the persecution that occurred in those camps, within the meaning of the RRA. Because Friedrich's actions rendered him ineligible for a visa under the RRA, the issuance of his visa in 1955 was void *ab initio*.[5] Accordingly, he was not lawfully admitted for permanent residence, and his subsequent naturalization was illegally procured.

The judgment is affirmed.

_____

_____

[5]Friedrich suggests that we must provide <u>Chevron</u> deference to the 1955 State Department decision to grant him a visa. <u>See</u> <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984). Under <u>Chevron</u>, we must first consider whether Congress has directly spoken to the precise question at issue. <u>Id.</u> at 842. Because we have concluded that Congress intended the RRA to prohibit the State Department from granting a visa to an armed Death's Head concentration camp guard, the *ultra vires* agency decision to grant Friedrich a visa is due no deference.