# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-2540

_____

United States of America,                    *
                                             *
            Plaintiff - Appellee,            *
                                             *   Appeal from the United States
      v.                                     *   District Court for the
                                             *   Southern District of Iowa.
                                             *
John Hansl,                                  *
                                             *
            Defendant - Appellant.           *

_____

Submitted: February 14, 2006
Filed: March 7, 2006

_____

Before RILEY, MELLOY, and BENTON, Circuit Judges.

_____

MELLOY, Circuit Judge.

      John Hansl ("Hansl"), a former SS concentration camp guard, appeals the district court's[1] order revoking his citizenship pursuant to 8 U.S.C. § 1451(a). We affirm.

_____

      [1]The Honorable Robert W. Pratt, United States District Judge for the Southern District of Iowa.

I.

After extensive discovery, the parties filed cross motions for summary judgment. The district court denied Hansl's motion and granted the government's motion. A number of facts concerning Hansl's wartime service and immigration application are in dispute. We base our decision on the following facts, which are set forth in a light most favorable to Hansl, the party against whom summary judgment was granted.

Hansl was born on January 21, 1925, in Donji Miholjac, Yugoslavia, in what is present-day Croatia. Hansl's family was ethnic German several generations removed, but he grew up speaking Croatian.

Germany invaded Yugoslavia in 1941. In February 1943, the Waffen SS came to Hansl's hometown and ordered one male from each ethnic German family to serve the Nazi cause. Since Hansl's father had small children to support, the Germans conscripted Hansl into the Waffen SS.

Hansl was assigned to the first company of the SS Death's Head Guard Battalion at Sachsenhausen concentration camp near Berlin, Germany. He was given an SS tattoo. Hansl's main duty was to prevent prisoners from escaping from the concentration camp. Accordingly, his duties included guarding prisoners from watch towers, marching prisoners at gunpoint to and from sites near the main camp where prisoners performed forced labor, and guarding prisoners while they performed forced labor. In these capacities, Hansl gave orders to the prisoners. When Hansl served as a guard in a watch tower, he was armed with a machine gun. When he escorted prisoners to and from labor sites, and while at the sites, Hansl was armed with a rifle. Hansl had strict orders to shoot any prisoner who tried to escape from the concentration camp. Hansl warned prisoners that these were his orders. On at least

one occasion, Hansl assisted in the search for a missing prisoner. When the prisoner was found, he was shot to death, although Hansl did not fire the shot.

Hansl requested a transfer to the front lines, but that request was denied. Hansl served at Sachsenhausen until on or about October 29, 1943. At that time, approximately 150 guards, including Hansl, were transferred out of Sachsenhausen. Hansl was transferred to a supply depot in Lublin, Poland. He served there until March 1944, when he was transferred to the Natzweiler-Struthof concentration camp in Natzweiler, France. His duties at Natzweiler were nearly identical to his duties at Sachsenhausen. Hansl also assisted in guarding prisoners on one train transport between camps while at Natzweiler.

In September 1944, Hansl was transferred to a combat unit. In November 1944 he was wounded in eastern France. He remained in various German military hospitals until January 1945, when he was transferred to Augsburg, Germany. In May 1945 Hansl was captured by the United States Army. He was detained and investigated for possible war crimes. At that time, he disclosed the foregoing wartime service history. In February 1947, he was transferred to the custody of French authorities. Hansl was released from a prisoner of war facility in November 1947. From there he went to an Austrian refugee camp.

Hansl applied for a United States visa in August 1955. On his application, Hansl listed as his wartime residence the "German Army." Hansl claims he told immigration officials that he had been a concentration camp guard. On August 29, 1955, United States State Department Vice Consul Richard Bloomfield issued Hansl a visa. The visa was approved by INS Officer Lester Greener, an INS inspector stationed in Salzburg, Austria. Hansl entered the United States at the port of New York on November 5, 1955. He was naturalized by the United States District Court for the Southern District of Iowa on October 30, 1961.

The government brought a single charge of illegal procurement to revoke Hansl's citizenship on July 23, 2003, pursuant to 8 U.S.C. § 1451(a). The basis for the government's action was the Refugee Relief Act of 1953 (the "RRA"). Pub. L. 83-203, 67 Stat. 400 (1953), amended by Pub. L. No. 83-751, 68 Stat. 1044 (1954). On appeal, Mr. Hansl argues that the district court erred in failing to correctly interpret and apply the RRA.

II.

We review de novo the district court's grant of summary judgment. Bear Robe v. Parker, 270 F.3d 1192, 1194 (8th Cir. 2001). "Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." Id. at 1195; Fed. R. Civ. P. 56(c).

In a denaturalization proceeding, the government has a heavy burden of proof and must provide "clear, unequivocal, and convincing" evidence to justify the revocation. Schneiderman v. United States, 320 U.S. 118, 125 (1943) (internal quotations omitted). A revocation is justified if naturalization was illegally procured. Fedorenko v. United States, 449 U.S. 490, 506 (1981). Naturalization was illegally procured if an individual entered the country and obtained residence without a valid immigration visa. Id. at 518 (holding that where an alien was ineligible for a visa as a matter of law, his citizenship was "illegally procured" and subject to revocation).

After World War II, the United States admitted European refugees "without regard to regular immigration quotas, under the Displaced Persons Act (DPA)." United States v. Friedrich, 402 F.3d 842, 844 (8th Cir. 2005); Pub. L. No. 80-774, 62 Stat. 1009 (1948). People who "'assisted the enemy in persecuting civil[ians]' were ineligible for visas under the [DPA]." Fedorenko, 449 U.S. at 510 (quoting the DPA, § 2(b), 62 Stat. 1009) (first alteration in original). In 1953, Congress passed the RRA.

-4-

Section 14(a) of the RRA states that "No visa shall be issued under this Act to any person who personally advocated or assisted in the persecution of any person or group of persons because of race, religion, or national origin." Pub. L. 83-203 at § 14(a), 67 Stat. at 406 (1953), amended by Pub. L. No. 83-751, 68 Stat. 1044 (1954).

The question in this appeal is whether the district court properly concluded that Hansl's admitted conduct constituted personal assistance in persecution, thereby making him ineligible for a visa under section 14(a) of the RRA. Hansl contends that the district court committed reversible error because it did not consider or give deference to immigration officials' testimony as to what the RRA means by "personally assisted." For example, Hansl contends that the district court erred by not considering the testimony of Mr. Melville Blake, a former Deputy Coordinator for the Refugee Relief Program in 1956 and Deputy Coordinator under the DPA. Blake testified in his affidavit that State Department policies would have made Hansl admissible under the RRA. Additionally, Hansl argues that the district court failed to consider the legislative history regarding the meaning of "personal assistance" under the RRA. We find these arguments unpersuasive.

We need not turn to either the immigration officials' testimony or legislative history to determine the meaning of "personally assisted" because the language of section 14(a) of the RRA is unambiguous. "Our starting point in interpreting a statute is always the language of the statute itself." United States v. S.A., 129 F.3d 995, 998 (8th Cir. 1997). "The plain meaning of a statute controls, if there is one, regardless of an agency's interpretation." Hennepin County Med. Ctr. v. Shalala, 81 F.3d 743, 748 (8th Cir. 1996). The RRA does not define "personally assisted." In the absence of an express definition for a term used in a statute, we interpret words as having their ordinary, common meaning. United States v. Fountain, 83 F.3d 946, 952 (8th Cir. 1996).

We have previously held that conduct similar to that admitted by Hansl constitutes personal assistance in persecution. Friedrich, 402 F.3d at 846 ("By guarding the perimeters of . . . [three] concentration camps to ensure that prisoners did not escape from these unspeakable conditions, Friedrich personally assisted in the persecution that occurred in those camps, within the meaning of the RRA."); see also Negele v. Ashcroft, 368 F.3d 981, 983 (8th Cir. 2004) (holding that serving as "an armed ghetto and concentration camp guard for the SS Death's Head Battalion [constitutes assisting] in Nazi persecution" for purposes of the Holtzman Amendment, 8 U.S.C. § 1182(a)(3)(E)(i)); United States v. Kumpf, --- F.3d ---, 2006 WL 408051 (7th Cir. 2006) (stating that service as a Death's Head Battalion Guard at Sachsenhausen constituted personal assistance). We agree with the district court that the facts in Friedrich are nearly identical to the facts in this case and that Friedrich is controlling here. As in Friedrich, it is not necessary for Hansl to have fired a weapon, harmed a prisoner, or killed a prisoner or enemy for Hansl's actions to constitute giving personal assistance. Kumpf, 2006 WL 408051 at *4 (stating that the "lack of affirmative acts . . . does not undermine the fact that he fulfilled his role as a guard. . . . [H]e presided over and witnessed the torture and murder of helpless people. . . . [H]is personal presence as an armed guard clearly assisted in the persecution of the prisoners."). Hansl's admitted conduct as a member of the Death's Head Battalion, guarding the perimeters of concentration camps while armed, issuing orders, and threatening to shoot anyone who attempted to leave a concentration camp is more than sufficient to meet the common definition of personally assisting in the persecution of a group of persons based on their race, religion, or national origin.

Finally, Hansl contends that the district court erred by failing to consider that Hansl's service was involuntary. He argues that such involuntary service makes this case distinguishable from Friedrich. It is irrelevant for purposes of our analysis whether Hansl joined the SS voluntarily. The district court correctly stated that "[t]he plain language of RRA section 14(a) does not contain a voluntariness requirement." Absent the express use of the word "voluntary," we must conclude that the statute

meant to include all those who assist in persecution. <u>Fedorenko</u>, 449 U.S. at 512 ("The plain language of the [DPA] mandates precisely the literal interpretation [that] an individual's service as a concentration camp armed guard – whether voluntary or involuntary - [makes the applicant] ineligible for a visa."). The fact that <u>Fedorenko</u> arose under the Displaced Persons Act and not the Refuge Relief Act does not change the principle that we presume that Congress would have expressly included a voluntariness requirement if it wanted to. Therefore, the fact that Hansl was conscripted into the Waffen SS does not affect our analysis.

## III.

Hansl's service in the Waffen SS as an armed guard at Schasenhausen and Natzweiler concentration camps constituted personal assistance in the persecution that occurred in those concentration camps within the meaning of the RRA. Because Hansl's actions constituted personal assistance in persecution, he was ineligible for a visa under the RRA and the issuance of his visa was improper. Accordingly, he was not lawfully admitted to the United States, and his subsequent naturalization was illegally procured.

We affirm the judgment of the district court.

_____