# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-3517

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JOSEPH WITTJE,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 6367—**Suzanne B. Conlon**, *Judge.*

_____

ARGUED APRIL 1, 2005—DECIDED SEPTEMBER 1, 2005

_____


Before EASTERBROOK, MANION, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* During World War II Joseph Wittje was a member of the Waffen SS, the paramilitary component of the Nazi Party. In 1950 he obtained a visa and entered this country. He became a citizen in 1959. He now appeals from a decision of the District Court for the Northern District of Illinois revoking his United States citizenship. We affirm.

**I.**

Joseph Wittje, an ethnic German, was born in 1920 and grew up in Deutsch St. Michael, an ethnic German enclave in Romania.[1] Prior to World War II, Wittje attended school until he was fourteen and then worked as a bricklayer.

Romania began World War II as a neutral state.[2] A period of political unrest in 1939 and 1940 that included the forced cession of Romanian territory to Hungary, Bulgaria, and the Soviet Union brought about political leaders who were strongly sympathetic to the Axis powers. By October 1940, several hundred thousand German troops had crossed into Romania. A month later, Romania joined the Tripartite Pact and became a member of the Axis.

In 1942, Wittje was drafted into the Romanian Army and took part in the invasion of Russia (Romania contributed a significant number of troops to the invasion of Russia). Wittje was wounded near Stalingrad and was eventually returned to his home in Romania. After recuperating from his wounds, in July 1943, Wittje was drafted by Germany pursuant to an agreement between Germany

---

[1] Ethnic Germans were a significant part of Romania's population prior to World War II. In 1939 approximately 500,000 ethnic Germans lived in Romania. *United States v. Negele*, No. 4:97CV01810 ERW, slip op. at 13 (E.D. Mo. July 20, 1999).

[2] The background information on the history of Romania, the Waffen SS, and Sachsenhausen (all facts that are not in dispute) in Part I of this opinion is drawn from the affidavit of Dr. Johannes Tuchel, a government expert witness; *Negele*, slip op. at 8-32; and the Library of Congress's Country Study on Romania, http://lcweb2.loc.gov/frd/cs/cshome.html (search for "Romania").

and Romania that permitted Germany to draft ethnic Germans living in Romania.

Wittje was not assigned to the German Army, the "Wehrmacht", but was instead assigned to the militarized branch of the Schutzstaffel (the "SS"), the Waffen SS (literally, the "armed SS"). The SS was the paramilitary component of the Nazi Party and was distinct from the Wehrmacht—it had its own command (including, for the bulk of its existence, one of the principal architects of the Holocaust, Heinrich Himmler). It also had a separate organizational structure, discipline, insignia, and uniforms. Originally conceived of as a cadre of bodyguards for Hitler (Schutzstaffel translates to "protection guard"), by the onset of World War II, the SS virtually controlled German state security (one of its principal offices was the Gestapo) and, most infamously, was responsible for the operation of the concentration camps. The SS was, therefore, ultimately charged with the responsibility for carrying out the "final solution"—the murder of the vast majority of European Jewry.[3]

Wittje's principal assignment during his service in the Waffen SS was to the 9th Company SS Death's Head Guard Battalion (Totenkopf-Wachbataillon) at the Sachsenhausen Concentration Camp ("Sachsenhausen").[4] Sachsenhausen, located approximately twenty miles from Berlin, was one of the original Nazi concentration camps. From the

---

[3] The Third Reich's victims included other groups as well—Slavs, the disabled, political dissidents, labor leaders, homosexuals, Roma and Sinti (also known as Gypsies), Jehovah's Witnesses, clergymen, and others the Nazis found objectionable.

[4] Sachsenhausen was also known as "Oranienburg." This is not our first case involving Sachsenhausen. *See United States v. Schmidt*, 923 F.2d 1253, 1255 (7th Cir. 1991).

mid-1930's (when the camp was constructed) to 1945 (when the camp was liberated by the Soviet Army), 200,000 people were imprisoned at the camp.

Prisoners at Sachsenhausen were forced to engage in slave labor including heavy construction and excavation work. Some prisoners were forced to test the durability of combat boots used by the Wehrmacht by wearing the boots on forced marches of thirty to forty miles in all weather. Prisoners at the camp were also farmed out to sub-camps, often near armaments plants to work in factories as part of the German war effort. The death of a prisoner at labor was of no consequence—prisoners were simply worked until they died ("annihilation through labor").

Conditions at the camp were hellish. Food was scarce and malnourishment and disease, including cholera and typhus, swept through the (often overcrowded) camp weakening and killing many. To the extent there was medical care, it often included ghoulish medical experiments subjecting the "patient" to extreme pain and often death.

Tens of thousands of prisoners were killed during the camp's operation. The life span for a prisoner was approximately three months. In addition to the death toll attributable to disease, exhaustion, starvation, and medical experiments, arbitrary executions were common. Guards would often beat or kill a prisoner for sport, sometimes using dogs turned loose on the prisoner. The camp also had a special facility for executing prisoners. Prisoners were taken one at a time to a room and told to undress for a medical examination. A "doctor" examined the prisoner's mouth under this pretense but really for the purpose of determining if the prisoner had any gold teeth that would be removed and melted down. Once the examination was over, prisoners were shot. The body was removed and the

room was cleaned to remove all traces of the execution—and another "patient" was brought in.

Wittje was assigned to Sachsenhausen from 1943 to 1945. At all stages of this litigation, Wittje has acknowledged that he was stationed for this period of time at the SS barracks near Sachsenhausen and that this barracks is where camp guards lived. The parties differ, however, on Wittje's role at the camp. The United States claims he was a guard at the camp, while Wittje claims he was a member of a "track and field sports competition unit" stationed near the camp for part of the time he was stationed in the 9th Company. Wittje also claims that he was later assigned work as a bricklayer and helped construct air raid shelters and bunkers. Wittje claims he never set foot in the prison camp proper.

In February 1945, Wittje was transferred from the Death's Head Guard Battalion to the 32nd SS Armored Division, a recently formed combat unit sent to the Eastern Front as part of an attempt to stem the Russian advance. Wittje's service in this unit was brief. He was wounded in combat on March 2, 1945, and sent to a military hospital where he remained for the rest of March. He was discharged from the hospital on March 31, 1945, but apparently did not return to his unit or take further part in what little remained of the German war effort. Sometime after the conclusion of the war in 1945, Wittje traveled with his family to Wels, Austria where he worked for a construction company until 1950.

In February 1950, Wittje applied for a "nonpreference" immigrant quota visa to enter the United States at the United States consulate in Salzburg, Austria. Wittje based his claim for this type of visa on the fact that he was a "Volksdeutscher [an ethnic German]; born in Rumania." He listed his nationality as "stateless" and stated that he resided in Wels, Austria. In an area of the application that

required the applicant to list his residences since turning fourteen years old, Wittje stated that he was in St. Michael, Rumania in 1943-1944, Haindorf, Germany in 1944-1945, and Wels, Austria from 1945 to the date of the application. Wittje did not mention his membership in the SS or his assignment to Sachsenhausen from 1943-1945.

Wittje's application was processed by Ralph McMahon, one of the two vice consuls in the Salzburg consulate assigned to review visa applications of ethnic Germans. McMahon approved Wittje's application the same day it was filed and Wittje, with his wife and son, traveled to, and arrived in, this country shortly thereafter.

Wittje settled in Chicago, and in 1959 applied for United States citizenship. The petition for naturalization Wittje completed required a petitioner to list his membership in any "organizations, clubs, or societies in the United States or in any other country . . . before the last 10 years." Wittje listed membership in a Roman Catholic youth organization. He did not mention his membership in Waffen SS. Wittje's petition was granted and he became a United States citizen on August 18, 1959.

On September 10, 2003, the United States filed a four-count complaint seeking to revoke Wittje's citizenship. The first count (and the only count at issue here) alleged that Wittje unlawfully procured a visa by failing to disclose his membership in a movement hostile to the United States—the Waffen SS.

At the conclusion of significant discovery (including the deposition testimony of Wittje), on June 18, 2004, the United States moved for summary judgment as to count one. Three days later, on June 21, Wittje moved to dismiss the complaint for lack of subject matter jurisdiction, failure to state a claim upon which relief may be

granted, and on the ground that the United States's efforts to revoke his citizenship constituted a violation of his rights to due process and equal protection. The district court denied the motion and subsequently granted the United States's motion for summary judgment and revoked Wittje's Certificate of Naturalization. This appeal followed.

## II.

Wittje raises three issues on appeal. First, he argues that the district court lacked the jurisdiction to reconsider a visa eligibility determination by consular officers. Second, he argues that denaturalization violates his constitutional right to equal protection. Third, he argues that the United States was not entitled to summary judgment because it was not entitled to judgment as a matter of law and there are genuine issues as to material facts.

### A. *Statutory Background*

Section 340(a) of the Immigration and Nationality Act of 1952 (the "INA") directs the United States (acting through the United States Attorney in the appropriate district) to seek the revocation of a certificate of naturalization when that certificate was " illegally procured . . . ." 8 U.S.C. § 1451(a). In order to be eligible for a certificate of naturalization, a person must have been "lawfully admitted [into the United States] for permanent residence." 8 U.S.C. § 1427(a)(1). Lawful admission into the United States in turn requires entry pursuant to a valid visa. 8 U.S.C. § 1181(a)(1). Read together, these provisions make it clear that a person cannot become a citizen by naturalization if his visa was illegally obtained and that a district court must revoke the citizenship of a person who illegally obtained a

visa. *Fedorenko v. United States*, 449 U.S. 490, 514 (1981) ("[O]ur cases have established that a naturalized citizen's failure to comply with the statutory prerequisites for naturalization renders his certificate of citizenship revocable as 'illegally procured' under 8 U.S.C. § 1451(a)."); *United States v. Tittjung*, 235 F.3d 330, 337 (7th Cir. 2000); *see also United States v. Stelmokas*, 100 F.3d 302, 306 (3d Cir. 1996); *United States v. Koziy*, 728 F.2d 1314, 1318 (11th Cir. 1984).

The principal immigration law in place in 1950 (when Wittje was issued a visa) was the Immigration Act of 1924, Pub. L. No. 60-139, ch. 190, 43 Stat. 153 (1924) (the "1924 Act"). The 1924 Act contained quotas on the number of aliens of any one nationality that were admissible to this country. § 11, 43 Stat. At 159-60.

Following World War II and in light of the upheaval in Europe, Congress amended the 1924 Act with the Displaced Persons Act of 1948, Pub. L. No. 80-774, ch. 647, 62 Stat. 1009 (1948) (the "DPA"). The DPA suspended the 1924 Act quotas for "eligible displaced persons." § 3, 62 Stat. at 1010-11. The DPA adopted the definition of "displaced person" from Annex I to the Constitution of the International Refugee Organization of the United Nations (the "IRO").[5] § 2(b), 62 Stat. at 1009. That definition excluded many ethnic

---

[5]   "The IRO was established in 1946 as a temporary specialized agency of the United Nations to deal with all aspects of the refugee problem in postwar Europe. The IRO established and administered a network of camps and resettlement centers where the refugees were registered, housed, fed, and provided with medical care. Where possible, the IRO provided for the refugees' rehabilitation and training, arranged legal protection for as long as they were stateless, and negotiated agreements for resettlement." *Fedorenko*, 449 U.S. at 495 n.5

Germans. IRO const., Annex I, Part II, § 4 (*reprinted at* S. Rep. No. 80-950, at 68 (1948)).

The DPA contained two provisions of critical importance in this case. First, § 12 of the DPA amended the 1924 Act to require 50% of the quota for German immigrants to be made available to ethnic Germans born in "Poland, Czechoslovakia, Hungary, Romania or Yugoslavia and who, on the effective date of this Act, reside in Germany or Austria." § 12, 62 Stat. at 1013-14. This quota-shifting provision had the effect of allowing ethnic Germans, who would otherwise not be eligible for visas to enter the United States because they were not covered by the IRO Constitution, to take advantage of the quotas available to those born in Germany.

The second important provision is § 13. Section 13 provides that "[n]o visas shall be issued under the provisions of this Act to any person who is or has been a member of, or participated in, any movement which is or has been hostile to the United States or the form of government of the United States." § 13, 62 Stat. at 1014.

B. *Subject Matter Jurisdiction*

Wittje's first argument concerns the jurisdiction of the district court to revisit a decision by a consular officer that an immigrant is eligible for a visa. Wittje argues that a district court does not have such jurisdiction.

Wittje is asking this court to reconsider and overrule our decision in *Tittjung*.[6] In that case we were faced with the

---

[6] Counsel for Wittje may be persistent but he is certainly redundant in the face of the legal precedent he helped to establish. He was counsel to the defendant in *Tittjung*. He was also

(continued...)

precise argument raised here. *Tittjung*, 235 F.3d at 338 ("Tittjung puts forth that Article III courts are without jurisdiction to proceed in reviewing visas and cancelling certificates of naturalization based on their findings of visa ineligibility."). We rejected that argument as without merit. *Id.* Nothing has changed.

The district court had all the jurisdiction necessary to consider whether Wittje was eligible for a visa. The district court had (and has) jurisdiction to hear all civil claims brought by the United States, 28 U.S.C. § 1345, and the district court had specific jurisdiction to consider a claim by the United States that Wittje's certificate of naturalization should be revoked, 8 U.S.C. §1451(a).

As we have explained above, a prerequisite to such a certificate is lawful admission into this country. Lawful admission requires, in turn, a valid visa. The determination that a person's citizenship should be revoked necessitates, therefore, a review of the visa process. *See United States v. Dailide*, 316 F.3d 611, 618 (6th Cir. 2003). We stand by what we wrote in *Tittjung*:

> While Tittjung is correct that our system does delegate specific powers to specific branches of government, he fails to acknowledge that ours is a system of checks

---

[6] (...continued)
counsel to defendants in *United States v. Dailide*, 316 F.3d 611 (6th Cir.), *cert. denied*, 540 U.S. 876 (2003); *United States v. Negele*, 222 F.3d F.3d 443 (8th Cir. 2000); *United States v. Leprich*, No. 86-CV-72531 (E.D. Mich. Dec. 10, 2003); *United States v. Krysa*, No. 1:99CV2736 (N.D. Ohio Nov. 16, 2000); and *United States v. Milius*, No. 96-2534-CIV-T-25A (M.D. Fla. Aug. 17, 1998). In each of these cases the court rejected precisely the argument counsel raises again here.

and balances. Under Article 1, Section 8 of the United States Constitution, Congress is empowered to establish standards for immigration. The 1952 Act delegates to the Executive Branch, and specifically the Attorney General, the powers of administration and enforcement. In such a situation, "[t]he courts, when a case or controversy arises, can always 'ascertain whether the will of Congress has been obeyed' and can enforce adherence to statutory standards." *See Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 954, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (citing *Yakus v. United States*, 321 U.S. 414, 425, 64 S.Ct. 660, 88 L.Ed. 834 (1944) and *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 72 S.Ct. 863, 96 L.Ed. 1153 (1952)).

*Tittjung*, 235 F.3d at 338. As it was in *Tittjung*, Wittje's argument that we do not have subject matter jurisdiction is without merit.

C.  *Equal Protection*

Wittje's next argument is that his denaturalization violates the Equal Protection Clause of the Constitution. His argument is premised on the fact that he was naturalized pursuant to § 1427(a) of the INA. Wittje posits that the INA, unlike the DPA, had no hostile movement restriction for immigrants. Wittje then asks us to explore the hypothetical situation where two former members of the Waffen SS were both naturalized in 1959. One of these men entered the country in 1950 while the other entered the country after the effective date of the INA. Wittje first notes that the determination of whether an immigrant has been lawfully admitted is based on the laws in place at the time an immigrant enters the country. *Fedorenko*, 449 U.S. at 514; *Tittjung*, 235 F.3d at 339 ("[L]awful admission is based on the circumstances as

they existed at the time of initial entry."); *see also Dailide*, 316 F.3d at 619 ("The question of whether an alien was lawfully admitted is answered, not by the law at the time of naturalization, but by the law at the time of entry."). Because they arrived at different times, the two men in his hypothetical would be treated differently: the immigrant who entered the country in 1950 would be subject to denaturalization, while the immigrant who entered after the effective date of the INA would not. Wittje suggests that such a situation would be a violation of the Equal Protection Clause because it would treat similarly situated persons (two former members of the Waffen SS applying for citizenship at the same time) differently.

We disagree. At the time Wittje entered this country, he was not eligible for a visa as a former member of a group hostile to the United States. It cannot be seriously disputed that Congress had a rational basis (all that is needed in this case) for such a restriction when it enacted the DPA or even now. Immigration to this country is a privilege, not a right, and certainly there can be no class of persons less deserving of that privilege than those who are, or were, a member of a group hostile to this country, particularly a well-armed and organized group that had helped oversee a reign of terror and murder on a then-unprecedented scale. That Congress let this restriction expire with the DPA or enacted new legislation (the INA) that did not contain such a restriction or significantly modified the restriction does not make the original restriction any less rational.

D. *Summary Judgment*

Wittje's final series of arguments is that the district court erred in granting summary judgment in favor of the United States. Our review is de novo. *McPherson v. City of*

*Waukegan*, 379 F.3d 430, 437 (7th Cir. 2004). A party is entitled to summary judgment in its favor when "there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law*." Id.*; Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### 1.   Wittje's admission statute.

Wittje first takes issue with the district court's conclusion that he was admitted to this country pursuant to the 1924 Act *and* the DPA. Wittje argues that he was admitted pursuant only to the 1924 Act, and consequently, there was no hostile movement restriction on his admission. Recall that it is the DPA (and not the 1924 Act) that contains the hostile movement restriction that forms the basis for the district court's ultimate conclusion that Wittje was not issued a valid visa. Wittje's argument is premised on the fact that his application for a visa states that he is applying for a visa pursuant to the 1924 Act and does not reference the DPA.

Wittje's argument is without merit. He received his visa pursuant to the DPA and the 1924 Act. The 1924 Act established quotas by nationality. As mentioned above, however, in the area for listing an applicant's nationality, Wittje's application for a visa states that he was "stateless." The salient fact in Wittje's application was his claim that he was entitled to a visa because he was a "Volksdeutscher; born in Romania." It was the DPA with its quota-shifting provision in § 12, and no other immigration statute in force in 1950 that Wittje can cite to, that would have made his ethnicity—a Volksdeutscher— relevant.

This conclusion is supported by the affidavit of Chester G.

Dunham. Dunham was, along with McMahon,[7] one of the two vice-consuls responsible for processing visa applications for ethnic Germans at the Salzburg consulate. Dunham was responsible for processing the first half of the alphabet, McMahon the second. Dunham testified that ethnic Germans from countries such as Romania were processed pursuant to the DPA and described the quota-shifting regime of § 12. Dunham's affidavit confirms what the statutes in effect at the time made clear— Wittje was admitted to this country pursuant to the 1924 Act and the DPA.

### 2.    Wittje's membership in the Waffen SS.

As we have noted, Wittje concedes he was a member of the Waffen SS. He raises two arguments, however, as to why his membership did not render him ineligible for a visa. First, Wittje argues that the Waffen SS was not, as of 1950, considered a movement that had been hostile to the United States. In other words, according to Wittje, a member of the Waffen SS, by virtue of such membership, was not ineligible for a visa pursuant to § 13 of the DPA.

There is no doubt that the Waffen SS was a movement hostile to the United States. Wittje's argument to the contrary is frivolous. In a March 1949 opinion letter, the chief of the State Department's Visa Division categorized the Waffen SS as a criminal organization and stated that its members were "definitely excluded" from receiving a visa pursuant to § 13 of the DPA. A State Department memorandum to the American Consul in Stuttgart, Germany dated August 3, 1949, reached the same conclusion using substantively identical language.

---

[7]   McMahon, who processed Wittje's visa, is deceased.

Also instructive is the position of the United States Displaced Persons Commission (the "DPC"). The DPC was established by the DPA and was charged with, among other things, "formulat[ing] and issu[ing] regulations, necessary under the provisions of this Act, and in compliance there- with, for the admission into the United States of . . . eligible displaced persons."

The Waffen SS was among those groups on the "Inimical List," a list of organizations, prepared by the DPC, that, as the name implies, were considered inimical to the United States. A memorandum circulated to "Senior Officers and Staff" of the DPC by the DPC Coordinator for Europe dated November 28, 1950, noted that the "[p]olicy of the [DPC] has been to consider either voluntary or involuntary membership in the Waffen SS . . . as a bar *per se* under Section 13 [of the DPA]." Another memorandum to the Chairman and Commissioners of the DPC cited approvingly the August 3, 1949, State Department memorandum as well as a September 23, 1949, decision of the State Department rejecting a consular recommendation that an SS officer be granted a visa to join his family in the United States. The Department rejection noted that "[t]he current policy of the Department is to recommend refusal of visas to aliens who were members of the SS at any time, regardless of whatever mitigating circumstances they may now try to offer in explanation of such membership . . . ."

In response to this contemporaneous evidence of § 13's applicability to the Waffen SS, Wittje cites to an April 1949 State Department telegram from Secretary of State Dean Acheson to the Chairman of the DPC. In that telegram, Acheson stated that § 13 was intended to cover "political or subversive groups of an ideological character" and "not considered as embracing military, naval, or air forces nor local constabularies . . . ." Wittje argues that statement

supports his conclusion that § 13 was not intended to cover "a private drafted into the Waffen SS." In effect, Wittje seeks to have this court view the Waffen SS as a military force akin to the Wehrmacht.

The problem for Wittje, however, is that, as pointed out above, the Waffen SS was not considered a part of, or akin to, the Wehrmacht, but was a paramilitary component of the Nazi party. The State Department's August 3, 1949 memorandum referenced above makes this distinction clear. The memorandum begins by noting that "[t]he Department has taken the view that service in the Wehrmacht or other regular branches of the armed forces of the enemy powers . . . would not serve as a bar to eligibility of person of German ethnic origin to receive a visa." The memorandum then goes on to note, however, that "members of such other military organizations as the Waffen [SS], proscribed as a criminal organization, are definitely excluded under the [DPA]." Wittje himself, in his "Amended Statement of Undisputed Material Facts and Counterstatement to [the] Government's Statement of Material Facts" admits that the Waffen SS was a "Nazi party organization."

Wittje's second argument is that, assuming the Waffen SS was considered a movement hostile to the United States, a person was a member of the Waffen SS for the purposes of the DPA only if they voluntarily joined the organization. Thus, Wittje, who claims he was drafted into the Waffen SS, argues he was not covered by § 13.

We disagree. In *Fedorenko*, the Supreme Court held that there was no "involuntariness" exception to the exclusion from visa eligibility in the DPA of persons who had "assisted the enemy in persecuting civil[ians]." 449 U.S. at 512. This exclusion arose as a result of the DPA's incorporation of the definition of displaced persons contained in Annex I to the IRO Constitution, specifically § 2(a) of Part II

of Annex I. The Court compared the absence of an involuntariness exception in § 2(a) to § 2(b). That section excluded from displaced person status those who had "voluntarily assisted the enemy forces since the outbreak of the second world war in their operations against the United Nations." IRO const. Annex I, § 2(b). The Court concluded that the use of the word "voluntarily" in § 2(b) and its absence from § 2(a) demonstrated "[t]hat Congress was perfectly capable of adopting a 'voluntariness' limitation where it felt that one was necessary." *Fedorenko*, 449 U.S. at 512. Thus, according to the Court, "the deliberate omission of the word 'voluntary' from § 2(a) compels the conclusion that the statute made all those who assisted in the persecution of civilians ineligible for visas." *Id.*

Like § 2(a) of Annex I, there is no voluntariness requirement in the plain language of § 13 of the DPA. Section 13 prohibits the issuance of a visa to "*any* person who is or has been a member of, or participated in, any movement which is or has been hostile to the United States or the form of government of the United States." (emphasis added). This language does not condition such participation or membership on whether the person was a volunteer or a conscript.

Other courts that addressed the issue have reached the same conclusion. *See United States v. Negele*, No. 4:97CV01810, slip op. at 59 (E.D. Mo. July 20, 1999) ("The [DPA] made no distinction between voluntary or involuntary membership in a hostile movement. Any membership or participation in any such hostile movement was a cause for mandatory disqualification."); *United States v. Schiffer*, 831 F. Supp. 1166, 1182 (E.D. Pa. 1993), *aff'd*, 31 F.3d 1175 (3d Cir. 1994) (table) (holding that prior to 1951, "*all* members of the Waffen SS were precluded from receiving visas") (emphasis added).

State Department and DPC policy at the time Wittje applied for a visa also make it clear that all members of the

Waffen SS were covered by § 13 regardless of whether such membership was voluntary. The State Department memorandum dated August 3, 1949, referenced above instructed the American Consul in Stuttgart, Germany to reject the visa application of a former member of the Waffen SS, "his contention that such membership was compulsory notwithstanding."[8] A November 28, 1950, DPC memorandum (also referenced above) noted that the "[p]olicy of the [DPC] has been to consider either *voluntary or involuntary* membership in the Waffen SS . . . as a bar per se under Section 13." (emphasis added).

In response, Wittje cites to a March, 1951, act of Congress, Pub. L. No. 82-14, ch. 23, 65 Stat. 28 (1951), and a 1951 DPC regulation. These documents, Wittje insists, retrospectively appended a voluntariness requirement to § 13. We disagree. As we have pointed out, the lawfulness of Wittje's entry into the United States must be determined under the law in effect at the time he entered. Any subsequent change (as the act of Congress and the DPC regulation were) has no bearing on the lawfulness of Wittje's entry into this country. In 1950, when Wittje applied for a visa and entered this country, a member of the Waffen SS was ineligible to receive a visa, regardless of the voluntariness of that membership.

### 3.   *Disputes as to material facts.*

This conclusion forecloses Wittje's argument that there are disputes as to material facts. The dispute between the parties as to the voluntariness of Wittje's service and whether Wittje served as a camp guard is immaterial. Wittje's service in the Death's Head Battalion of the Waffen

---

[8]   As we have noted, a DPC memorandum dated March 14, 1950, quoted approvingly this conclusion of the State Department.

SS, a fact he concedes, regardless of whether that service was voluntary and regardless of whether that service included time as a camp guard or was limited to participating in sports competitions, rendered Wittje ineligible for a visa at the time of his application.

### III.

Joseph Wittje served during World War II as a member of the Waffen SS. That service, regardless of its nature or voluntariness, rendered Wittje ineligible for a visa at the time he applied for one. Summary judgment was, therefore, appropriate in favor of the United States. Wittje's arguments concerning the jurisdiction of the district court and this court, as well as his claim that his right to equal protection was violated, are meritless. The decision of the district court is

AFFIRMED.

A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*