# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 05-2972

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSIAS KUMPF,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 03 C 944—**Lynn Adelman**, *Judge.*

_____

ARGUED DECEMBER 7, 2005—DECIDED FEBRUARY 23, 2006

_____

Before EASTERBROOK, MANION, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* During World War II, Josias Kumpf was a member of the Waffen Schutzstaffel and a guard at Nazi concentration camps. In 1956, without disclosing this service, Kumpf obtained a visa to enter the United States, entered the country, and later obtained citizenship. The government, after discovering Kumpf's past, brought suit seeking his denaturalization, alleging that he improperly obtained a visa and illegally procured citizenship. The district court granted the government's motion for summary judgment and revoked Kumpf's citizenship. Kumpf appeals. We affirm.

## I.

Josias Kumpf, an ethnic German, was born in Nova Pasova, Yugoslavia on April 7, 1925. Kumpf attended school for less than three years, spending the majority of his youth farming with his father. Germany invaded Yugoslavia on April 6, 1941. After the invasion, Germany mustered ethnic Germans in Yugoslavia for its forces. A drummer marched through Kumpf's town in October 1942, alerting all young men to report to the local school for a health exam. After examining Kumpf, German officials instructed him to report to the train station later that month.

Kumpf complied and was transported to Oranienburg, Germany where he completed basic training. There he was issued a uniform, a rifle, a blood-type tattoo, and both the distinctive skull and SS insignia to wear on his uniform. Thus, Kumpf began serving in the Waffen Schutzstaffel, or armed protection guard. The Waffen SS was the paramilitary component of the Nazi Party and was distinct from the German Army, the Wehrmacht. Although originally intended to serve as bodyguards for Hitler, by World War II the SS assumed responsibility for German state security and the operation of the infamous Nazi concentration camps.

After training, Kumpf was assigned to the SS Death's Head Battalion Sachsenhausen, which was later renamed the SS Death's Head Guard Battalion Sachsenhausen. He remained in Oranienburg, guarding prisoners at Sachsenhausen Concentration Camp. As this court recounted in detail in *United States v. Wittje*, 422 F.3d 479, 482-83 (7th Cir. 2005), prisoners at Sachsenhausen were detained in hellish conditions, forced to perform grueling labor, subjected to medical experimentation, and executed. Kumpf worked at the camp as an armed guard, assigned to watch

over the prisoners from perimeter guard towers. If an escape attempt occurred, Kumpf was trained to fire warning shots and, if necessary, shoot the escaping prisoner. Kumpf testified that he never faced such a situation. During his tenure at Sachsenhausen, Kumpf was paid, granted leave to return to his home, and promoted once.

On October 29, 1943, Kumpf was one of 150 guards transferred from Sachsenhausen to Trawniki Labor Camp in German-occupied Poland. A few days later, on November 3, 1943, approximately 8,000 prisoners at Trawniki Labor Camp were executed in Aktion Erntefest, or Operation Harvest Festival. The victims were instructed to strip off their clothing and then led to pits that the prisoners themselves previously dug, on the premise that they were air-raid trenches. Members of the SS then fired on the naked prisoners with varying degrees of accuracy. The parties dispute whether Kumpf arrived before the massacre, but Kumpf admits that he guarded the pits after the executions to watch for escaping survivors. Although instructed to shoot any escaping victim, no attempts were made on his shifts. Soon after the massacre, a group of Jews were brought to Trawniki to sort the victims' clothing, recover the dental gold from the bodies, and burn the corpses. Kumpf recalled the stench of the burning bodies.

While stationed at Trawniki, Kumpf again obtained leave to visit his family. After returning from leave, Kumpf left Trawniki in early 1944 to assume duty in Occupied France. There, among other tasks, he guarded a mobile detachment of prisoners from concentration camps who were forced to construct platforms for launching missiles against Great Britain. Following the Allied invasion of Normandy, Kumpf's unit retreated into Germany. Kumpf claims that he was sent to the eastern front, captured, and held as a

prisoner of war by the Soviet Army for the remainder of the war.

After the war, Kumpf reunited with his family in Austria. He married Elisabeth Eremity on May 8, 1948. In 1956, Kumpf applied for a visa to enter the United States with his wife and three children. His visa application states that he served in the "German Army" in Germany, Poland, and France, omitting any reference to the SS. Kumpf received a visa on March 23, 1956. About two months later, he was admitted to the United States in New York.

Kumpf then settled in Chicago. He filed an application for naturalization in February 1964. Again, the application omitted any reference to the SS; in response to a question regarding his memberships in military or other organizations, Kumpf asserted that he was in the "German Army." The United States conferred citizenship on Kumpf on May 9, 1964. Kumpf, now a widower, worked continuously for the Vienna Sausage Company until retirement, and fathered two more children with his wife in this country.

After discovering wartime documents relating to his service in the SS, the government filed a four-count complaint seeking Kumpf's denaturalization. The district court granted summary judgment to the government, addressing only the government's argument that Kumpf's citizenship was illegally procured because he personally assisted in persecution and was therefore ineligible for a visa under the Refugee Relief Act. Kumpf appeals, arguing that his citizenship was not illegally procured, that the federal courts lack subject matter jurisdiction over this determination, and that his denaturalization would be a violation of equal protection.

## II.

If an individual "illegally procured" citizenship, Congress provides for the revocation of the individual's naturalization. 8 U.S.C. § 1451(a). To procure citizenship lawfully, an individual must be "lawfully admitted for permanent residence" into the United States, among other requirements. 8 U.S.C. § 1427(a). Kumpf was admitted for permanent residence based on a visa issued under the Refugee Relief Act. To ascertain whether Kumpf illegally procured citizenship, we must therefore evaluate the validity of his visa.

Kumpf first argues that this court lacks subject matter jurisdiction to consider the validity of the visa. Kumpf submits that Congress empowered the consular officers of the United States with exclusive authority "relating to the granting or refusal of visas." 8 U.S.C. § 1104(a). Since the consular officer has such exclusive authority, he argues, the federal courts cannot displace the consular function by reviewing the decision to grant a visa. This court previously decided this issue, determining that the federal courts do have jurisdiction "to examine visa eligibility." *United States v. Tittjung*, 235 F.3d 330, 338 (7th Cir. 2000). This holding was recently reaffirmed in *United States v. Wittje*, in which we explained:

> The district court had all the jurisdiction necessary to consider whether Wittje was eligible for a visa. The district court had (and has) jurisdiction to hear all civil claims brought by the United States, 28 U.S.C. § 1345, and the district court had specific jurisdiction to consider a claim by the United States that Wittje's certificate of naturalization should be revoked, 8 U.S.C. § 1451(a) . . . . [A] prerequisite to such a certificate [of naturalization] is lawful admission into this country. Lawful admission requires, in turn, a valid visa. The determina-

> tion that a person's citizenship should be revoked necessitates, therefore, a review of the visa process.

*Wittje*, 422 F.3d at 485-86 (citation omitted). Kumpf attempts to distinguish this holding by noting that his visa was issued under the Refugee Relief Act and not the earlier Displaced Persons Act, which was at issue in *Wittje*. This distinction, however, is immaterial to the jurisdictional argument. The federal courts have jurisdiction to review the visa process, regardless of the statute under which the visa was issued. Kumpf's jurisdictional argument is without merit.

Having jurisdiction, we turn to the question of whether Kumpf obtained a valid visa. We review the district court's grant of summary judgment de novo. *Wittje*, 422 F.3d at 487 (citation omitted). Summary judgment is appropriate if the moving party demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Because of the "precious" nature of United States citizenship, "the Government carries a heavy burden of proof" in denaturalization cases, and the evidence justifying revocation "must be clear, unequivocal, and convincing and not leave the issue in doubt." *United States v. Fedorenko*, 449 U.S. 490, 505 (1981) (internal quotations and citations omitted).

To evaluate the validity of the visa under this standard, we apply the governing statute at the time Kumpf's visa was issued, the Refugee Relief Act. *See Tittjung*, 235 F.3d at 339-40 (examining the immigration act in effect " '[a]t the time of petitioner's initial entry into this country' " (quoting *Fedorenko*, 449 U.S. at 514)). Kumpf argues that because this act expired by the time of his naturalization, it cannot be used to revoke his citizenship. This argument is without merit: because Kumpf received a visa under the Refugee

Relief Act, the court must look to that act to evaluate whether the visa was issued properly. *Id.*

The Refugee Relief Act of 1953 provides that a person who "personally advocated or assisted" in persecution is ineligible for a visa. Pub. L. No. 83-203 § 14(a), 67 Stat. 400 (1953). The Refugee Relief Act added the word "personally." The prior governing act, the Displaced Persons Act of 1948, which was amended in 1950, considered any person who "advocated or assisted" in persecution to be ineligible for a visa, regardless of whether he "personally" did so. Pub. L. No. 81-555 § 13, 64 Stat. 219 (1950). The amendment thus narrowed the class of potential immigrants who could be excluded based on their assistance in persecution. *See United States v. Friedrich*, 402 F.3d 842, 845 (8th Cir. 2005) (citing *United States v. Lileikis*, 929 F. Supp. 31, 38-39 (D. Mass. 1996)).

Under the narrower language of the Refugee Relief Act, Kumpf argues that his service in the Waffen SS does not constitute personal assistance in persecution, and therefore does not disqualify him from obtaining a visa. The Supreme Court described conduct that would satisfy the broader "assisting in persecution" under the Displaced Persons Act by stating:

> an individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians. Other cases

>   may present more difficult line-drawing problems but
>   we need decide only this case.

*Fedorenko*, 449 U.S. at 512 n.34. Thus, an armed guard who took direct action against prisoners unquestionably assisted in persecution. It is undisputed that persecution occurred at the locations where Kumpf served. The issue in this case, however, is whether Kumpf's particular actions as a guard constituted "personal" assistance in the persecution under the Refugee Relief Act.

In this case, like the example in *Fedorenko*, Kumpf was a guard who was issued a uniform, armed with a rifle, received wages, and took leave to visit home. He admits to standing guard over prisoners at Sachsenhausen, Trawniki, and in Occupied France. He also admits to receiving orders to shoot escaping prisoners, although he claims he never needed to do so. In his own words, he described his duty at Trawniki as follows:

>   Q.  What kind of guard duty did you do?
>
>   A.  Kind of the—I was watching them shoot some
>       people and some of them [came] out and [ran] away
>       again. There was hurt [*sic*] and not enough so [they]
>       still convulse[d], some of them, you know. That's
>       what we ha[d] to watch. . . . Some people [were]
>       shot and not good enough so they [were] still able
>       to move, you know. That's what we ha[d] to watch
>       outside so that they [would] go no place.

Kumpf Dep. at 73-74. He reiterated this same scene later in his deposition: ". . . some of them move[d]. I say what we ha[d] to [do was] watch, they say some of them are still half way alive and they run out. So—[ ] if somebody come[s] like that, shoot them to kill, shoot to kill. I didn't have to shoot [any]body." *Id.* at 88.

Kumpf emphasizes in his brief that he "never personally harmed any individual" and never "aimed or discharged his weapon at anyone." He argues that his limited conduct cannot constitute personal assistance in persecution. This lack of affirmative acts, however, does not undermine the fact that he fulfilled his role as a guard. The Refugee Relief Act's parameters are not limited to personally harming or personally shooting individuals; the language instead addresses personal assistance. Kumpf's personal presence functioned to discourage escape attempts and maintain order over the prisoners. His participation was not through monetary contributions, mere membership, or other indirect actions. Rather, he presided over and witnessed the torture and murder of helpless people. Because no one tried to escape during his watch, he claims he did not have to shoot anyone. Nevertheless, his personal presence as an armed guard clearly assisted in the persecution of the prisoners. As the Eighth Circuit explained, "[t]he pertinent question is [ ] whether Friedrich 'personally assisted' on persecution, not whether he engaged in direct persecution." *Friedrich*, 402 F.3d at 845. The Eighth Circuit concluded that "[b]y guarding the perimeter of the [ ] concentration camps to ensure that prisoners did not escape from these unspeakable conditions, Friedrich personally assisted in the persecution that occurred in those camps." *Id.* at 846. We agree with this reasoning. While the precise parameters of personal assistance under the Refugee Relief Act have not been delineated by the courts, Kumpf's own actions clearly constitute personal assistance in persecution. His claim of no affirmative or direct acts of harm does not alter this conclusion.

Kumpf next argues that his service in the Waffen SS was involuntary. He submits that the involuntariness of his service should be considered in determining his eligibility for a visa under the Refugee Relief Act. Even assuming that

Kumpf served involuntarily, the Refugee Relief Act does not require a person to assist voluntarily in persecution. In the context of the Displaced Persons Act, courts have held that the voluntariness of the service is irrelevant. *Fedorenko*, 449 U.S. at 513 ("an individual's service as a concentration camp armed guard—whether voluntary or involuntary—made him ineligible for a visa."); *Wittje*, 422 F.3d at 489 ("there is no voluntariness requirement in the plain language" of the Displaced Persons Act). Similarly, the plain language of the Refugee Relief Act lacks a voluntariness requirement.

Relatedly, Kumpf next relies on two memoranda: a 1951 memorandum of the Displaced Persons Commission and a 1985 government memorandum of an interview with Richard Bloomfield, a visa officer at the time of Kumpf's visa issuance. These memoranda, Kumpf argues, demonstrate that visa officers considered the voluntariness of SS service in determining visa eligibility. Kumpf suggests in his brief that the government bears the burden of proving that his visa was not issued "with full knowledge of his service in the Waffen SS and in consideration of his involuntary conscription." Against this, in his sworn deposition taken for this case, Ambassador Bloomfield clarified that a watch tower guard at a concentration camp who was compelled into service would not be eligible for a visa. Furthermore, Kumpf himself testified that he did not disclose to the visa officers anything about his service with the Waffen SS. Regardless, the plain language of the Refugee Relief Act does not provide for a consideration of voluntariness in assessing whether an individual personally assisted in persecution. The statute is not ambiguous, and therefore we do not need to address the agency's construction of the statute. *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Finally, to the extent that Kumpf claims that the federal courts cannot

"reverse the decision to grant Mr. Kumpf's visa" based on his involuntary service, this argument simply recharacterizes his jurisdictional argument discussed above.

Given Kumpf's candid recitation of his service, even if such service were compelled, we conclude that through his actions he personally assisted in persecution, and was therefore ineligible for a visa. Accordingly, his visa was invalid, making his admission to this country unlawful and his citizenship illegally procured. The district court therefore properly revoked Kumpf's citizenship.

Kumpf's final argument is that his denaturalization would violate his right to equal protection under the law. Kumpf argues that two individuals with identical past service would face different results under the immigration laws if they entered the country at different times, under different immigration acts. This court previously addressed the equal protection argument in *Wittje*:

> It cannot be seriously disputed that Congress had a rational basis (all that is needed in this case) for such a restriction when it enacted the DPA or even now. Immigration to this country is a privilege, not a right, and certainly there can be no class of persons less deserving of that privilege than those who are, or were, a member of a group hostile to this country, particularly a well-armed and organized group that had helped oversee a reign of terror and murder on a then-unprecedented scale. That Congress let this restriction expire with the DPA or enacted new legislation (the INA) that did not contain a restriction or significantly modified the restriction does not make the original restriction any less rational.

*Wittje*, 422 F.3d at 486-87. The fact that Kumpf entered the country under the Refugee Relief Act instead of the Dis-

placed Persons Act does not affect the reasoning in *Wittje*. Kumpf's equal protection argument therefore fails. Finally, we note that in his statement of issues, Kumpf also lists a due process violation. Since Kumpf does not develop this argument or cite any cases in support of it in his brief, he has waived it. *See* Fed. R. App. P. 28(a)(9)(A); *Heft v. Moore*, 351 F.3d 278, 285 (7th Cir. 2003).

### III.

Kumpf's actions as an armed guard at Nazi concentration camps constitute personal assistance in persecution under the Refugee Relief Act. Because of this service, Kumpf was ineligible for a visa, making his entry into this country improper and his citizenship illegally procured. Denaturalization is therefore warranted. Kumpf's arguments that this court lacks subject matter jurisdiction to evaluate the validity of his visa and that his denaturalization would violate equal protection are unavailing. Accordingly, we AFFIRM the judgment of the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*