In the

# United States Court of Appeals
## For the Seventh Circuit

No. 03-3671

JOHN DOE,

*Petitioner*,

*v.*

ALBERTO R. GONZALES,
Attorney General of the United States,

*Respondent*.

Petition to Review an Order by the
Board of Immigration Appeals.
No. 72 414 062

ARGUED FEBRUARY 23, 2007—DECIDED APRIL 17, 2007

Before POSNER, KANNE, and ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*. John Doe is the pseudonym of a former lieutenant in El Salvador's army who has sought asylum in the United States. He has been permitted to litigate his claim pseudonymously because of his fear that if he is returned to El Salvador he will be killed. An immigration judge denied his claim for asylum and other relief back in 2001, and despite the novelty and importance of the case the Board of Immigration Appeals affirmed the immigration judge's decision without opinion.

The roots of the case are in a notorious episode in El Salvador's vicious civil war, which raged from 1980 to 1992 and included such atrocities as the murder of a Catholic archbishop while he was celebrating mass, the rape and murder of four American nuns, and the Jesuit murders out of which this case arises.

Doe in 1989 was an army lieutenant assigned as an instructor at the military academy in San Salvador. The head of the academy, a colonel named Benavides, one evening convened a meeting that he ordered Doe to attend. At the meeting Benavides announced that he had been ordered to kill Father Ellacuria, a Jesuit who was the president of a university in San Salvador and was regarded as an ally of the rebels. Another colonel, Hernandez, ordered Doe to accompany the members of the Atlacatl Battalion (which in 1981 had massacred the entire population—men, women, and children—more than 200 in all, of the village of El Mozote) who would conduct the operation under the command of a lieutenant named Espinoza, a member of the battalion.

Doe expressed to Hernandez misgivings about the mission. The two agreed that the order to kill the Jesuit was immoral, but that to object would risk their being killed. Doe prepared for the mission by donning battle fatigues, painting camouflage on his face, and fetching his rifle and ammunition. He then accompanied the 30 to 40 members of the Atlacatl Battalion assigned to the mission.

When they arrived at the university, around midnight, Doe walked about the university grounds (with which he was not familiar—unlike the members of the Atlacatl Battalion, who had reconnoitered the site several days before the attack), saw two women in a room, heard shots, and later saw bodies on the ground. Six Jesuits, including

the university's president, were killed, along with a female cook and her daughter. There were no survivors.

Doe did not give orders, fire his gun, seize anyone, or block anyone's attempted escape. But when he returned to the base, he assisted in destroying log books identifying the soldiers who had participated in the raid.

All this is according to Doe's testimony, which the immigration judge credited.

The Salvadoran ministry of defense appointed an "Honor Commission" of military officers to investigate the murders. The commission ordered Doe's arrest. He was tried for the murders along with Benavides. Both were convicted and given prison sentences. Seven others—members of the Atlacatl Battalion who had participated in the mission, including the commander, Espinoza—were also tried, but they were acquitted, though several of them had confessed to participating in the murders.

The trial took place in 1991. The following year, as part of the accord that ended the civil war, the United Nations appointed a "Truth Commission" for El Salvador to investigate "serious acts of violence that have occurred since 1980 and whose impact on society urgently demands that the public should know the truth." United Nations Truth Commission, *From Madness to Hope: The 12-Year War in El Salvador* 18 (1993). High-ranking officers ordered Doe not to cooperate with the commission. But he did cooperate, revealing not only to the commission but also to Father Tojeira, a leading Jesuit, what he knew about the murders at the university.

The commission issued its report the following year. The report condemned the high command of the Salvadoran armed forces, criticized the 1991 trial in which Doe had

been convicted, and recommended that he be pardoned. *Id.* at 54. Within a week the government amnestied everyone—including members of the high command, Benavides, and Doe—who had been accused of or implicated in the murders. On April 1, 1993, Doe was released from prison. Four days later, having learned that members of the high command suspected that it was he who had spilled the beans to the Truth Commission and Father Tojeira, and believing that he would be killed if he remained in El Salvador, Doe fled the country with the assistance of Jesuits, first to Mexico and then to the United States.

The immigration judge denied Doe's application for asylum and related relief on three independent grounds: that Doe had "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. §§ 1101(a)(42)(B), 1158(b)(2)(A)(i), 1231(b)(3)(B)(i); that he had been convicted of a "particularly serious crime," *id.* §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii), namely murder, and that he lacked a well-founded fear of persecution should he be returned to El Salvador, since the political situation in that country had improved since 1993.

The murder of the Jesuit priests was persecution on account of political opinion. In contrast, the murder of the two women, if unrelated to their political opinions and thus motivated solely by a desire to eliminate witnesses to the murder of the priests, would not be persecution within the meaning of the asylum statute because it would not be on account of race, religion, nationality, membership in a particular social group, or political opinion. *Nakibuka v. Gonzales*, 421 F.3d 473, 478 (7th Cir. 2005); *Vasquez v. INS*, 177 F.3d 62, 65 (1st Cir. 1999) (per

curiam); *In re McMullen*, 19 I. & N. Dec. 90, 95-97 (B.I.A. 1984). It would be different had the women been murdered because they were believed to be involved in the Jesuits' political activities, *Chavarria v. Gonzalez*, 446 F.3d 508, 512-14, 521-22 (3d Cir. 2006), or, as we'll see, had the murders been a necessary step in the persecution, as they would have been had the women been shot trying to shield the priests with their bodies. But neither point is argued, or bears on the issues in this case; it is enough that the murdered priests were victims of persecution.

Whether Doe "assisted" or otherwise "participated" in the persecution of the Jesuits who were killed is a close question. His mere presence does not seem like assistance. He was brought in under odd circumstances that do not suggest that he played any role in making the mission more likely to succeed. In contrast to the members of the Atlacatl Battalion, he was given no intelligence about the mission, no particular assignment to fulfill, did not help plan the mission, and did not know any of its details or even the layout of the university. His subsequent conviction in the face of the acquittals of the culpable defendants is consistent with his having been included on the mission because they might need a scapegoat. True, his presence bulked up the attacking force from 30 to 40 to 31 to 41, and in other circumstances that could be significant assistance. But since the attack was upon eight unarmed, defenseless civilians, his presence did nothing to embolden the attackers or assure the attack's success. Because his presence did not increase the probability that the attack would succeed, his case differs from the cases of the former Nazi concentration camp guards, who even if they never shot or even detained anyone contributed to the persecution that went on inside the camps by deterring

attempts at escape. See, e.g., *Fedorenko v. United States*, 449 U.S. 490, 512 and nn. 33-34 (1981); *United States v. Kumpf*, 438 F.3d 785, 789-91 (7th Cir. 2006); *Naujalis v. INS*, 240 F.3d 642, 646-47 (7th Cir. 2001); see also *Singh v. Gonzales*, 417 F.3d 736, 739-41 (7th Cir. 2005).

We are mindful of a dictum in *United States v. Ciurinskas*, 148 F.3d 729, 734 (7th Cir. 1998), to the effect that membership in a Nazi police battalion tasked with exterminating Jews was assistance in persecution even if the member in question had not "personally participated" in the killings carried out by the battalion. But suppose Ciurinskas had not been a member of the police battalion, but a soldier from a front-line combat unit that did not engage in persecution who had been forced to accompany the police battalion on one operation and had made no contribution to the operation's success. That would be like this case and the dictum would not be applicable.

Doe's case differs as well from *Miranda Alvarado v. Gonzales*, 449 F.3d 915, 925-30, 933 (9th. Cir 2006), a case of an interpreter assigned to interrogations in which torture was used. See also *Higuit v. Gonzales*, 433 F.3d 417, 418, 420-21 (4th Cir. 2006). Doe's case is closer to that of "an individual who did no more than cut the hair of female inmates before they were executed," which the Supreme Court said in *Fedorenko* "cannot be found to have assisted in the persecution of civilians," 449 U.S. at 514 n. 34. Or to that of the petitioner in *Hernandez v. Reno*, 258 F.3d 806 (8th Cir. 2001), who, forced to be a member of a firing squad, fired to one side of the target, and was held not to have assisted in persecution.

But analysis is complicated by a statement in the record from a sergeant who was one of the members of the Atlacatl Battalion involved in the mission, confessing to

having killed the two women in the room in which Doe had seen them and adding that Doe had "ordered him to stay there and not to allow anyone to leave the place." The sergeant's statement also says that Doe had "introduced himself to Lt. Espinoza and told him they were going to . . . the University because he had knowledge that the people staying there were terrorists and that they had to be eliminated."

The immigration judge did not mention the sergeant's statement, which may well have been part of the effort of the Salvadoran military to pin the blame for the murders on Doe and Benavides. For despite his confession, the sergeant was acquitted. Moreover, as we'll see shortly, the trial was a farce and statements made in it, or during the Honor Commission's "investigation," have little credibility.

Doe testified in the asylum hearing that the sergeant's statement was the truth but that he (Doe) had given no order. Doe was testifying in imperfect English and may have meant only that part of what the sergeant said was true but not the part about Doe's having ordered the sergeant to stay with the women and not allow them to leave. The interpretation of Doe's testimony is crucial, since if he had carried an order to Espinoza or had ordered the women confined to enable the murder of the priests to be accomplished without interference, that would constitute assistance in the attack and therefore mark Doe as a persecutor. The immigration judge failed to resolve this issue, though it is critical to whether Doe assisted in persecution.

Even if Doe's going along on the mission did not increase the likelihood that the mission would be accomplished and so was not "assistance" in persecution, it can be

argued that his presence at the attack may nevertheless have been "participation" in it. But the blind affirmance of the immigration judge's decision by the Board of Immigration Appeals would prevent our upholding the Board on that ground. The affirmance was by a single member of the Board, and such an affirmance merely "approves the result reached in the decision below; it does not necessarily imply approval of all of the reasoning of that decision, but does signify the Board's conclusion that any errors in the decision of the immigration judge or the Service were harmless or nonmaterial." 8 C.F.R. § 1003.1(e)(4)(ii).

When a statute enforced by an administrative agency is vague, the agency's interpretation is entitled to considerable deference. This is true of the immigration statutes. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424-25 (1999). But despite its silence in the present case, no earlier decision by the Board (or for that matter by the courts) answers the question whether mere presence at the scene of persecution constitutes participation in it. *Fedorenko*, as we saw, indicates that mere presence is not *assistance* in persecution. Our decision in *Kumpf* equates "personal presence" to "assistance," but the "personal presence" to which we referred was not passive—was not "mere" presence. Assistance, we explained (for we did not distinguish between it and participation), is "not limited to personally harming or personally shooting individuals . . . . Kumpf's personal presence functioned to discourage escape attempts and maintain order over the prisoners." *United States v. Kumpf*, *supra*, 438 F.3d at 790; see also, e.g., *United States v. Friedrich*, 402 F.3d 842, 845-46 (8th Cir. 2005). So far as appears (if the sergeant's statement is discounted), Doe's presence did not discourage attempts at escape, help to maintain order, or otherwise contribute to the persecution. See *Singh v. Gonzales*, *supra*, 417 F.3d at 739-40.

But maybe participation connotes something less than assistance. Maybe—but probably not. The Board has not parsed the terms "assist" and "participate," but instead has treated them as interchangeable, *In re Rodriguez-Majano*, 19 I. & N. Dec. 811, 814 (B.I.A. 1988); see also *In re A-H*, 23 I. & N. Dec. 774, 784-85 (A.G. 2005), as we did in *Kumpf* and the Fifth Circuit did in *Bah v. Ashcroft*, 341 F.3d 348, 351 (5th Cir. 2003) (per curiam). One might think participation analogous to being a member of a conspiracy, and assistance to being an aider or abettor; but these are equally serious crimes. *Petkiewytsch v. INS*, 945 F.2d 871, 880 (6th Cir. 1991), suggests, however, not implausibly, that participation in persecution is graver than mere assistance to the persecutors.

Liability as an aider or abettor—for it seems unlikely that Doe could be regarded as an actual member of the conspiracy to murder the Jesuits—requires that a defendant "support, encourage or incite the commission of a crime." *People v. Palmer*, 220 N.W.2d 393, 397 (Mich. 1974). In *People v. Llanos*, 570 N.E.2d 1072, 1073-74 (N.Y. 1991) (per curiam), for example, the defendant was held not to be an aider or abettor of drug crimes even though she had warned a drug dealer that the police were coming. There was no evidence that the warning had been heeded. She shouted the warning as the police were climbing the stairs to the dealer's apartment, and the police entered the apartment before the occupants could react.

There are two further wrinkles that neither the Board's nor the courts' decisions point us the way to ironing out: Doe's role in the attempt to cover up the massacre, and his subsequent decision to blow the whistle to the Truth Commission and the Jesuits. The immigration judge thought that the cover-up amounted to participation in

persecution and that Doe's subsequent whistleblowing was irrelevant. Yet because, as we have seen, the form of affirmance that the Board employed did not commit the Board to adopting the immigration judge's reasoning, we cannot assume that his interpretation of the significance of these two factors (a cover-up and redemptive activity) is the Board's interpretation. *Onwuamaegbu v. Gonzales*, 470 F.3d 405, 412 and n. 5 (1st Cir. 2006); *Lin v. U.S. Dept. of Justice*, 416 F.3d 184, 190-91 (2d Cir. 2005); cf. *Miranda Alvarado v. Gonzales*, *supra*, 449 F.3d at 920-24; *Zhang v. Gonzales*, 426 F.3d 540, 543-44 (2d Cir. 2005).

A persecution that is covered up is more likely to succeed than one that is not. So had Doe participated in the planning of the cover-up *before* the attack, in order to make subsequent detection less likely, he would be guilty of having assisted in the persecution of the murdered priests. But there is no hint of that. So far as appears, he was first ordered to destroy incriminating documents after the murders. Is an accessory after the fact a persecutor? Probably not. If you help a murderer cover his tracks, you are an accessory after the fact to the murder, *People v. Zierlion*, 157 N.E.2d 72 (Ill. 1959); *People v. Prado*, 67 Cal. App. 3d 267, 271 (1977), but you are not a murderer. And recall the distinction that the cases make between persecution and killing a witness to the persecution.

As for Doe's subsequent efforts to reveal facts about the murders that the high command had concealed, a Second Circuit case did hold a petitioner's redemptive act, though "admirable," insufficient to override his being found to have assisted in persecution. *Xie v. INS*, 434 F.3d 136, 143 (2d Cir. 2006). The court pointed out that the statute that bars persecutors from obtaining asylum does not say that engaging in such efforts is a possible defense. *Id.* at 143-44.

The court added, however: "We of course have no occasion to, and emphatically do not, conclude that redemptive behavior is necessarily irrelevant to the inquiry as to whether an applicant has assisted in persecution. We decide only that the BIA was not in error when it concluded that in these circumstances Xie's behavior, even with its redemptive aspects, amounted to 'assistance in persecution' . . . and that he was therefore ineligible for asylum." *Id*. at 144. So if the Board of Immigration Appeals thought Doe's attenuated participation in the persecution of the Jesuit priests outweighed by his efforts (at personal risk) to bring the main persecutors to justice, *Xie* would not stand in the way of granting him asylum.

So far we have been discussing just the immigration judge's first ground for denying asylum to Doe. His second ground was that Doe had been convicted of murder. The murder trial, however, was a farce. Doe's lawyer was on the payroll of the high command and focused his efforts not on defending his client but on asserting the innocence of the high command, though no members of that body were on trial. The lawyer presented no evidence on Doe's behalf and conducted no cross-examination of the prosecutor's witnesses. The judge did not instruct the jury on the law. The defendants other than Benavides and Doe were acquitted even though some of them—the actual triggermen—had confessed. And Doe was amnestied while his appeal was pending—along with the members of the high command, none of whom had been charged. Independent observers called the trial a "simulated trial," "rigged from beginning to end;" "the whole thing was a cover-up" and Doe's conviction "totally incomprehensible factually and legally." It was a kangaroo court to make kangaroos blush. The UN Truth Com-

mission said that Doe should be pardoned and the members of the high command at the time of the murders expelled from the armed forces. The commission found that they had ordered the murders and orchestrated the cover-up, which included Doe's conviction.

The immigration judge declined to consider the legitimacy of Doe's conviction. His ground was that a conviction cannot be questioned in an immigration proceeding. That is true in general, e.g., *Mansoori v. INS*, 32 F.3d 1020, 1023-24 (7th Cir. 1994); *Pablo v. INS*, 72 F.3d 110, 113 (9th Cir. 1995); *Chiaramonte v. INS,* 626 F.2d 1093, 1098-99 (2d Cir. 1980), because an immigration hearing is not a suitable forum for adjudicating a collateral attack on a conviction. But it is not true in a case in which the proceeding that resulted in the conviction was demonstrably, and it is fair to say admittedly, a travesty—a parody—of justice. *Esposito v. INS*, 936 F.2d 911, 914-15 (7th Cir. 1991).

The distinction is familiar from the history of habeas corpus. Long before it was considered a routine vehicle for challenging constitutional errors in criminal proceedings, the Supreme Court held in *Moore v. Dempsey*, 261 U.S. 86, 91 (1923) (Holmes, J.), that "if the case is that the whole proceeding is a mask—that counsel, jury and judge were swept to the fatal end by an irresistible wave of public passion, and that the State Courts failed to correct the wrong, neither perfection in the machinery for correction nor the possibility that the trial court and counsel saw no other way of avoiding an immediate outbreak of the mob can prevent this Court from securing to the petitioners their constitutional rights." Doe's murder trial was of that character. We can find nothing in the immigration laws, the purposes that animate them, or decisions by the Board of Immigration Appeals or by the courts that

would compel the denial of asylum on the basis of such a conviction.

And had the amnesty not intervened, mooting Doe's appeal, his conviction would in all likelihood have been reversed and in that event would not have barred asylum. *Will v. INS*, 447 F.2d 529, 532-33 (7th Cir. 1971); *Pinho v. Gonzales*, 432 F.3d 193, 214-16 (3d Cir. 2005); *Marino v. INS*, 537 F.2d 686, 691-92 (2d Cir. 1976); *In re Rodriguez-Ruiz*, 22 I. & N. Dec. 1378, 1379-80 (B.I.A. 2000); *In re Roldan-Santoyo*, 22 I. & N. Dec. 512, 523 (B.I.A. 1999) (en banc), vacated on other grounds under the name of *Lujan-Armendariz v. INS*, 222 F.3d 728 (9th Cir. 2000). It is true that, according to the State Department's 2000 country report on El Salvador, under Salvadoran law "a jury verdict cannot be appealed. However, the defendant may appeal the sentence to the Supreme Court for reduction. [And] a jury verdict may be overturned by a mistrial determination that there were serious problems with jury panel selection or errors in the trial procedure." There were errors galore in the trial procedure.

The last question is whether it is true, as the immigration judge thought, that in any event Doe has no reason to believe that he'll be persecuted if he is returned to El Salvador. Citing the 2000 country report, the immigration judge described El Salvador as a "constitutional, multiparty democracy" in which the former rebels now control a plurality of seats in the national legislature and the military has been curbed. He failed to mention evidence that foretold a more ominous destiny for Doe in El Salvador. The members of the high command had reacted to the Truth Commission's report with high dudgeon, calling it "garbage," a "Jesuit conspiracy," and "biased and insolent." None of them was ever prosecuted, of course,

but the Jesuits are still trying to bring them to justice—and Doe is one of their main witnesses. The ARENA party, which ruled El Salvador during the civil war, was still in power at the time of Doe's immigration hearing and remains in power. Former members of the high command, though no longer on active duty, occupy senior positions in the party. In the face of all the evidence, ARENA continues to deny that "the distinguished generals who were members of the high command" had anything to do with the murders.

All this evidence was ignored by the immigration judge. The former members of the high command, with the connivance of their political party, may be unwilling to tolerate Doe's assisting the Jesuits' attempt to have them prosecuted, perhaps before an international tribunal. Professor Douglas Cassel, a legal consultant to the Truth Commission and an expert witness for Doe—and a witness whose credibility was not questioned by the immigration judge—testified: "I have never had any familiarity with any case where I felt more strongly that there was a higher degree, a virtual certainty of death or serious physical injury if people were required to return to their homeland. These are dangerous killers down there. They have gotten away with murder before. They are confident that they can get away with murder again . . . . I believe that there is a very, very high likelihood that if either of the [Does—that is, either Doe or his wife, whose asylum case has been severed from her husband's] were to return to El Salvador, they would be in grave physical danger of death, torture, or other form of serious physical injury."

Granted, the former generals are private persons. But if the government turns a blind eye to their procuring Doe's

murder, the murder would be persecution within the meaning of the statute. *Galina v. INS*, 213 F.3d 955, 958 (7th Cir. 2000); *Sotelo-Aquije v. Slattery*, 17 F.3d 33, 37 (2d Cir. 1994).

We do not say that Doe has in fact a well-founded fear of persecution if he is returned to El Salvador, but only that the immigration judge's unexplained disregard of the evidence of such a fear requires, along with the judge's other errors, a remand. The petition for review is therefore granted and the matter returned to the Board for further proceedings (including an updated assessment of the relevant political conditions in El Salvador) consistent with this opinion. *Gonzales v. Thomas*, 547 U.S. 183 (2006) (per curiam); *INS v. Ventura*, 537 U.S. 12, 16-17 (2002) (per curiam); *Melendez v. U.S. Dept. of Justice*, 926 F.2d 211, 218-20 (2d Cir. 1991).

VACATED AND REMANDED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*